368 F.Supp.2d 1009 (2005)
Joe BROWN, Christopher Darrell, and Mitch Wiest, on behalf of INDIGENOUS INMATES AT THE NORTH DAKOTA STATE PRISON, Plaintiffs,
v.
Tim SCHUETZLE, Warden, North Dakota State Prison; Patrick Benson, Deputy Warden of Operations, NDSP; Jeans Sullivan, Unit Manager, NDSP, Defendants.
Case No. A1-03-127.
United States District Court, D. North Dakota, Southwestern Division.
May 4, 2005.
*1010 *1011 Steven M. Light, Larivee & Light, Ltd., Grand Forks, ND, for Plaintiffs.
Joe Brown, NDSP, Bismarck, ND, pro se.
Christopher Darrell, NDSP, Bismarck, ND, pro se.
Mitch Wiest, NDSP, Bismarck, ND, pro se.
Bill Peterson, Attorney General's Office Civil Litigation, Bismarck, ND, for Defendants.
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT
HOVLAND, Chief Judge.
Before the Court is the Defendants' Motion to Dismiss or, in the alternative for Summary Judgment filed on December 8, 2004. The Plaintiffs oppose the motion. For the following reasons the motion is granted.
I. BACKGROUND
The named plaintiffs are Native American inmates at the North Dakota State Penitentiary in Bismarck, North Dakota. Joe Brown is a member of the Spirit Lake Band of Dakota Indians, Mitch Weist is a member of the Standing Rock Sioux Tribe, and Christopher Darrell is a member of the Tohono O'Dhan Nation. See Complaint, pp. 1-2. The Defendants are employees of the North Dakota Department of Corrections and Rehabilitation, Prisons Division, employed at the North Dakota State Penitentiary. Tim Schuetzle is the director of the Prisons Division and serves as Warden; Patrick Branson is Deputy Warden of Operations at the prison; and Jean Sullivan is a Unit Manager at the prison. See Complaint, p. 3.
A. THE SWEAT LODGE
Of the 1,296 inmates held in custody at the North Dakota State Penitentiary (NDSP), the Missouri River Correctional Center, and the James River Correctional Center, 53 individuals declared their preference for the Native American religion.[1] The inmates can practice the Native American religion through sweat lodge ceremonies, pipe ceremonies outside the sweat lodge, talk circles, and Native American religious study group meetings. In doing so, the inmates may possess spiritual items such as personal pipes, medicine bags, and feathers. The NDSP also makes Native American religious literature and films available to the inmates. A group entitled the Native American Indian Culture Group has been established at the NDSP to promote the Native American culture. Within the group, a Spirituality Committee works *1012 with Native American religious matters. See Affidavit of David L. Vaughn, ¶ 3.
Since 1978, a sweat lodge has been made available to inmates at the NDSP. Sweat lodge ceremonies are conducted twice a week for the general population. All inmates are allowed to attend the ceremonies. The sweat lodge is prepared by an inmate given the position of "sweat lodge worker." The sweat lodge worker is a paid position that is recommended by the Spirituality Committee and approved by NDSP's Job Placement Committee. The sweat lodge worker is allowed to recruit another inmate to assist in the preparation of the sweat lodge, or delegate the duty if necessary. Preparation of the sweat lodge includes bringing items needed for the ceremony to the sweat lodge, handling the tarps, starting a fire, and heating the rocks. Any inmate is allowed to lead the ceremony. See Affidavit of David L. Vaughn, ¶ 4.
B. GRIEVANCES OF JOE BROWN
This litigation arises out of an incident involving the plaintiff, Joe Brown. Brown was authorized to assist in setting up the sweat lodge by Chaplain David Vaughn, but "took additional unauthorized individuals out to the Sweat Lodge to help him set things up for the sweat even though he was instructed not to do this by the yard crew supervisor." As a result, on August 1, 2004, Unit Manager Jean Sullivan wrote a memorandum to Warden Tim Schuetzle stating "[e]ffective immediately, Joseph Brown will no longer be able to go out to the Sweat Lodge to set it up for sweats." See Plaintiffs' Ex. 1. Brown immediately wrote inmate requests to several staff members questioning the decision. See Complaint, p. 5; Plaintiffs' Ex's 2-6.
On August 14, 2002, Brown received a response from the office of the Deputy Warden of Operations informing him that it was that office which had directed Sullivan and Chaplain Vaughn to end his duties at the sweat lodge. The letter explained that Brown was bringing inmates out to the sweat lodge without approval despite repeated warnings not to do so. See Plaintiffs' Ex. 7. On August 15, 2002, Brown, Mitch Weist, and Chris Bald Eagle signed a Step One Grievance Form grieving the decision to end Brown's duties at the sweat lodge. The grievance specifically requested that Brown be reinstated to his Wednesday duties of setting up the sweat lodge.[2]See Plaintiffs' Ex. 9.
On August 21, 2002, Sullivan responded and stated that the grievance was invalid because it contained more than one signature. Sullivan also wrote "I am not clear whom is being grievanced [sic]: Chaplain Vaughn, Deputy Warden Branson, Ray Heidt, or me." See Plaintiffs' Ex. 9.
On November 13, 2002, Brown filed an inmate request asking Warden Schuetzle why he was not yet allowed to set-up the sweat lodge. In response, Warden Schuetzle informed Brown that his Step One Grievance on that issue had been denied on August 21, 2002, and Brown failed to file a Step Two Grievance within the allotted five-day time period. Nevertheless, Warden Schuetzle gave Brown permission to file a Step Two Grievance regarding reinstatement to his Wednesday duties of setting up the sweat lodge. See Plaintiffs' Ex. 10.
With Warden Schuetzle's permission, Brown filed a Step Two Grievance Form on November 16, 2002, seeking to regain his duties of "preparing the sweat lodge." *1013 Brown also requested a meeting with the Religious Advisory Board to discuss the situation. Warden Schuetzle denied the grievance on November 19, 2002, stating that Brown did not lose his privileges for religious reasons, but for security reasons; namely, bringing unauthorized individuals out to the sweat lodge to help set-up. Warden Schuetzle reminded Brown that he was never given the position of sweat lodge worker. Brown was merely allowed to assist in setting up the sweat lodge. See Plaintiffs' Ex. 11.
On December 20, 2002, Elaine Little, the Director of the North Dakota Department of Corrections and Rehabilitation, conducted a review of Brown's Step One and Step Two Grievances, and authored the following response:
You were previously, and inadvertently, allowed to assist in setting up the sweat lodge by Chaplain Vaughn. There are individuals who are currently assigned as sweat lodge workers. Warden Schuetzle has provided you with a proper response, and I find no reason to overturn his decision. Your appeal is denied.
See Plaintiffs' Ex. 12.
C. THE "PROTECTION OF CEREMONIES" MEETING
On March 8-9, 2003, a council of "Spiritual Leaders" and "Bundle Keepers" of the Lakota, Dakota, Nakota Nations, Cheyenne Nation, and Arapaho Nations gathered for a meeting entitled "Protection of Ceremonies" in Eagle Butte, South Dakota. See Plaintiffs' Ex. 14, p. 1. The council was convened by Chief Arvol Looking Horse, the 19th Generation Keeper of the White Buffalo Calf Pipe, with the stated purpose being "to discuss the protection and abuse and exploitation of [indigenous] ceremonies." It was decided that Chief Looking Horse would establish the proper protocol for the Seven Sacred Rites.[3] Included among the Seven Sacred Rites is the Inipi or sweat lodge ceremony.
At the meeting, Chief Looking Horse announced "from March 9th, 2003 and forward, there will be no non-Natives allowed in our sacred Hocoka (our sacred alters) where it involves our Seven Sacred Rites." See Plaintiffs' Ex. 14, p. 1. With respect to the sweat lodge ceremony, Chief Looking Horse stated as follows:
I-ni-pi (Purification Ceremony): Those that run this sacred rite should be able to communicate with Tuncasila (our Sacred Grandfathers) in their Native Plains tongue. They should also have earned this rite by completing [the Vision Quest] and the four days and four years of the [Sundance].
Id. at 2. There was also discussion about allowing only Plains Tribal members to take part in the Seven Sacred Rites, but Chief Looking Horse concluded that history could not allow for such a decision. Id. at 2-3.
D. REQUEST FOR CHANGES TO THE SWEAT LODGE CEREMONY
On April 12, 2004, the Native American Indian Culture Group wrote a memorandum to Chaplain Vaughn requesting changes in light of Chief Looking Horse's pronouncements at the "Protection of Ceremonies" meeting. The memorandum reads as follows:
This request pertains to the decision made by the White Buffalo Calf Pipe Keeper, Arvol Looking Horse, and the *1014 many other listed Elders, who are Pipe and Medicine Bundle Keepers who say the Seven Sacred Rites of the Plains Nations should only be conducted in a traditional manner.
The Sweat Lodge (Inipi), is one of the Seven Sacred Rites, and we are requesting that the Wednesday evening Sweat Lodge Ceremony be conducted as our Elder's say it should be; that the person conducting the ceremony should be able to communicate with Tunkasila in his native tongue, should be a 4 day participant in the Hanbleciya (Vision Quest); and a 4 year Sun Dancer.
Joe Brown has completed all these protocol's of the Dakota Nation and he wants to conduct the Wednesday Sweat Lodge Ceremony as our Elder's say it should be done. This includes the exclusion of all non-natives to the wholly Traditional way the Wednesday Sweat Lodge Ceremony will henceforth take place.
Non-native People's need to understand and respect the decision's of our Elder's and Spiritual Leader's.
We the undersigned, agree with the decision/s [sic] of our Elder's and Spiritual Leader's concerning the "BARRING" of non-natives from all of the Seven Sacred Rites....
We pray your approval is forthcoming concerning the Wednesday evening Sweat Lodge Ceremony. Thank you.
See Plaintiffs Ex. 15.[4]
Following up on the memorandum, plaintiff Mitch Weist filed an inmate request on April 30, 2003, asking that Brown be reassigned to the task of setting up and operating the sweat lodge. See Plaintiffs' Ex. 17. Weist opined that Joe Brown would satisfy all the requirements articulated by Chief Looking Horse. Warden Schuetzle responded with concern, and asked "Who is Arvol Looking Horse? And how do we know his beliefs are representative of all the tribes at NDSP?" Id. Warden Schuetzle also questioned whether Brown had any documentation of his qualifications to conduct the sweat lodge ceremony. On July 17, 2003, two more inmate requests were filed regarding the same subject. In response, Corky Stromme wrote "Mr. Brown is not allowed to go out early. The people who are allowed to light the fire are already designated." See Plaintiffs' Ex.'s 19-20.
Warden Schuetzle responded to both the inmate requests and the Native American Culture Group's request in a memorandum dated July 17, 2003. Warden Schuetzle referenced the denial of Brown's Step Two Grievance from July of 2002 in dismissing the current requests. Warden Schuetzle wrote:
You have been given answers, you just don't agree with them. Mr. Brown is not permitted to attend the sweat lodge grounds to prepare the fire, or the pipe, nor is he recognized as the pipe keeper from the inmate populations. We already have a pipe keeper, and that is Nelson White Tail. Mr. Brown is permitted to practice his religion as a participant in the sweat ceremony, but he is not cleared to lead the ceremony.
See Plaintiffs' Ex. 21.[5]
E. PRESENT DISPUTE
On September 24, 2003, Joe Brown, Christopher Darrell, and Mitch Weist filed this civil rights action in the United States *1015 District Court for the District of North Dakota.[6] The complaint states their claim as follows:
Inmates claim they are being deprived of their right to freely exercise their relition [sic] under the First amendments [sic] to the United States Constitution. In addition plaintiffs state that their rights under 42 U.S.C.1983 and under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. Secs.2000cc et seq. (2000) are being violated by the defendants. Acting under color of state law, the defendants are depriving inmates of their right to participate in traditional religious rights and ceremonies run according to protocol established by religious leaders from their tribes.
See Complaint, p. 3. In turn, the Plaintiffs seek the following relief:
1. Plaintiffs request that the Inipi ceremony at the North Dakota State Prison be operated in a manner consistent with the protocols established by Chief Orvol [sic] Looking Horse.
2. If no other inmate meets the qualifications to run the ceremony then inmate Joe Brown must be assigned to that role.
Id. at 8.
While the Plaintiffs were originally represented by counsel, their attorney has since withdrawn. See Docket No. 28. As a result, the Plaintiffs are proceeding in the matter pro se. On December 2, 2004, the Defendants filed a Motion to Dismiss or, in the alternative for Summary Judgment. The Plaintiffs have filed a responsive brief opposing the motion.
II. LEGAL DISCUSSION
A. MOTION TO DISMISS
The Defendants seek a dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. It is well-established that "a district court `has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1).'" Harris v. P.A.M. Transport, Inc., 339 F.3d 635, 637 n. 4 (8th Cir.2003) (quoting Osborn v. United States, 918 F.2d 724, 728 n. 4 (8th Cir.1990)) (citing Land v. Dollar, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)). Unlike a motion to dismiss under 12(b)(6), to look at matters outside the pleadings does not convert a Rule 12(b)(1) motion to a motion for summary judgment. Id. The Eighth Circuit has explained that the difference between the two rules "is rooted in the unique nature of the jurisdictional question." Osborn, 918 F.2d 724, 729 (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.1981)). "[A] district court has `broader power to decide its own right to hear the case than it has when the merits of the case are reached.'" Id. Jurisdictional issues, whether they involve questions of law or fact, are for the court to decide. Id.
"Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction its very power to hear the case  there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn, 918 F.2d 724, 730. As a result, "no presumptive truthfulness attaches to the plaintiff's allegations, and *1016 the existence of undisputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." Id. "Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Id.
The thrust of the Defendants' jurisdictional argument is that the Plaintiffs lack standing. Specifically, the Defendants contend that the action is not ripe for adjudication. It is well-established that "[u]nder Article III of the Constitution, federal courts `may adjudicate only actual, ongoing cases or controversies.'" McCarthy v. Ozark School Dist., 359 F.3d 1029, 1035 (8th Cir.2004); see Public Water Supply Dist. No. 8 of Clay County, Missouri v. City of Kearney, Missouri, 401 F.3d 930, 932 (8th Cir.2005) ("Article III limits court to deciding actual "Cases" and "Controversies," thereby prohibiting them from issuing advisory opinions.") (citations omitted). Various doctrines, including the doctrine of ripeness, "provide the tools used to determine whether a plaintiff presents a justiciable case or controversy." Id.; Mausolf v. Babbitt, 85 F.3d 1295, 1300 (8th Cir.1996) ("From this `bedrock requirement' flow several doctrines  e.g., standing, mootness, ripeness, and political question  which `state fundamental limits on federal juridical power in our system of government.'") (citations omitted). The Eighth Circuit explained:
The ripeness doctrine flows both from the Article III "cases" and "controversies" limitations and also from prudential considerations for refusing to exercise jurisdiction. Nebraska Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1037 (8th Cir.2000). The doctrine seeks "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Id. (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). The ripeness inquiry requires examination of both the "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Id. at 1038 (quoting Abbott Labs., 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681). To be ripe for decision, the harm asserted must have matured enough to warrant judicial intervention. Johnson v. Missouri, 142 F.3d 1087, 1090 n. 4 (8th Cir.1998). The plaintiffs need not wait until the threatened injury occurs, but the injury must be "certainly impending." Employers Ass'n v. United Steelworkers AFL-CIO-CLC, 32 F.3d 1297, 1299 (8th Cir.1994) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).
Paraquad v. St. Louis Housing Authority, 259 F.3d 956, 958-59 (8th Cir.2001). "Whether a case is ripe depends on the state of the case at the time of review, not at the time of filing." Public Water Supply Dist. No. 8 of Clay County, Missouri v. City of Kearney, Missouri, 401 F.3d 930, 932 (8th Cir.2005) (citing Blanchette v. Connecticut Gen. Ins. Corp., 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); Nebraska Public Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1039-40 (8th Cir.2000)). When an action is not ripe for adjudication, dismissal for lack of jurisdiction is the appropriate remedy. See Missouri Soybean Ass'n v. United States Environmental Protection Agency, 289 F.3d 509, 513 (8th Cir.2002).
To further their ripeness argument, the Defendants characterize the Plaintiffs' claim as merely a request for injunctive relief requiring Joe Brown to conduct the sweat lodge ceremony, nothing more. See Defendants' Brief in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment, p. 6. In support of their position, the Defendants note that Brown has never been prevented from taking part *1017 in, or conducting sweat lodge ceremonies. By Brown's own admission, he "regularly conducted" the sweat lodge ceremonies, and continues to do so. See Plaintiffs' Reply, p. 5; Defendants' Ex. "A"; Affidavit of David L. Vaughn, ¶ 5. For that reason, the Defendants assert that this action is not ripe for adjudication.
While cognizant of the facts recited by the Defendants, the Court does not construe the Plaintiffs' complaint so narrowly as to only include a request that Joe Brown be allowed to conduct the sweat lodge ceremonies.[7] As previously mentioned, the complaint requests the following relief:
1. Plaintiffs request that the Inipi ceremony at the North Dakota State Prison be operated in a manner consistent with the protocols established by Chief Orvol [sic] Looking Horse.
2. If no other inmate meets the qualifications to run the ceremony then inmate Joe Brown must be assigned to that role.
See Complaint, p. 8. The Plaintiffs are essentially challenging the manner in which the sweat lodge ceremony is conducted at the NDSP. Specifically, because the sweat lodge ceremony is not being conducted in accordance with Chief Looking Horse's pronouncements, the Plaintiffs allege their civil rights are being violated.
At the "Protection of Ceremonies" meeting, Chief Looking Horse established several requirements for the sweat lodge ceremony. See Plaintiffs' Ex. 14, p. 1. The Defendants have keyed in on one of those requirements, namely the qualifications needed to conduct the ceremony. As stated by Chief Looking Horse, "[t]hose that run this sacred rite should be able to communicate with Tuncasila (our Sacred Grandfathers) in their Native Plains tongue. They should also have earned this rite by completing [the Vision Quest] and the four days and four years of the [Sundance]." Id. at 2. The parties agree that Joe Brown satisfies the stated requirements. However, Brown is not the only inmate allowed to conduct the sweat lodge ceremony. According to the July 17, 2004, memorandum authored by Warden Schuetzle, the designated pipe keeper is Nelson White Tail, a member of the Arikara Nation. See Plaintiffs' Ex. 21.
Additionally, Chief Looking Horse stated that non-Native Americans should be prohibited from taking part in the Seven Sacred Rites, which includes the sweat lodge ceremony. The NDSP allows any inmate to attend the ceremonies. See Affidavit of David L. Vaughn, ¶ 5.
For the above-stated reasons, the Court finds that plaintiffs Joe Brown and Christopher Darrell do not lack standing. It is clear that the sweat lodge ceremony, as it is currently being operated at the NDSP, does not fully comply with Chief Looking Horse's pronouncements established at the "Protection of Ceremonies" meeting. The Court finds that the matter is ripe for adjudication.
Although not argued by either party, it appears that plaintiff Mitch Weist lacks standing as a result of his transfer to another federal facility. It is the Court's understanding that inmate Weist was transferred to a prison facility in Appleton, Minnesota, because he was not complying with sex-offender treatment. See Defendants' Reply, p. 6. It is well-established that "a prisoner's claim for injunctive relief to improve prison conditions is moot if he *1018 or she is no longer subject to those conditions." Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir.1985) (citing Wycoff v. Brewer, 572 F.2d 1260, 1262 (8th Cir.1978)). Therefore, when a prisoner is transferred he no longer has standing. Id.; Smith v. Hundley, 190 F.3d 852, 855 (8th Cir.1999) ("We agree that Smith's transfer from ISP to ASP a few weeks prior to trial rendered his case moot.... Smith was transferred to ASP, and he is no longer subject to the alleged unlawful policies or conduct of ISP officials"). Accordingly, the Court finds that plaintiff Mitch Weist lacks standing in the present action as a result of his transfer. The remaining references to "Plaintiffs" will denote only Joe Brown and Christopher Darrell.
B. SUMMARY JUDGMENT
It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir.2000). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir.2003). A mere trace of evidence supporting the non-movant's position is insufficient. A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial. F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The Plaintiffs contend that the NDSP violated their First Amendment free-exercise right when it failed to implement all of the requirements proposed by Chief Arvol Looking Horse at the "Protection of Ceremonies" meeting held in Eagle Butte, South Dakota, in March 2003. The Plaintiffs allege that a sweat lodge ceremony that does not follow Chief Looking Horse's requirements is "meaningless." The Plaintiffs claim arises under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA).
With regard to the constitutional claim, the Eighth Circuit has explained:
Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting. Turner v. Safley, 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A prison regulation or action is valid, therefore, even if it restricts a prisoner's *1019 constitutional rights if it is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89, 107 S.Ct. 2254. Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. Id. at 89-90, 107 S.Ct. 2254. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Id. at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have a "significant `ripple effect'" on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimus cost to valid penological interests." Id. at 90-91, 107 S.Ct. 2254.

. . . . .
In analyzing [a free-exercise] claim, we consider the threshold issue of whether the challenged governmental action "infringes upon a sincerely held religious belief," Hamilton v. Schriro, 74 F.3d 1545, 1550 (8th Cir.1996), and then apply the Turner factors to determine if the regulation restricting the religious practice is "reasonably related to legitimate penological objectives." O'Lone v. Estate of Shabazz, 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). We accord great deference to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security." Goff v. Graves, 362 F.3d 543, 549 (8th Cir.2004).
Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 982-83 (8th Cir.2004).
While the Plaintiffs' constitutional claim is actionable under 42 U.S.C. § 1983, the Plaintiffs raise a statutory claim under RLUIPA. "By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to a constitutional free exercise claim." Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 986 (8th Cir.2004). The statute reads as follows:
No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person 
(A) is in furtherance of a compelling governmental interest; and
(B) is the least restrictive means furthering that compelling governmental interest.
42 U.S.C. § 2000cc-1(a) (footnote added).[8] RLUIPA contains similar language to that contained in its unconstitutional predecessor statute the Religious Freedom Restoration Act (RFRA) of 1993. Murphy, 372 F.3d 979, 987 (citing City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). "In RLUIPA, Congress resurrected RFRA's language, but narrowed the scope of the act, limiting it to laws and regulations concerning institutionalized persons or land use." Id. (citing 42 U.S.C. §§ 2000cc & 2000cc-1). Due to the similarity between the two statutes, RFRA cases may be looked to for guidance in deciding RLUIPA cases. Id.
*1020 As a threshold matter under RLUIPA, the Plaintiffs must show that there is a "substantial burden" on their ability to exercise their religion. Murphy, 372 F.3d 979, 988 (citing 42 U.S.C. § 2000cc-2(b)). This requires the Court to answer two separate questions: (1) is the burdened activity "religious exercise," and if so (2) is the burden "substantial."
RLUIPA defines "religious activity" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). As for "substantial burden" the term is not defined by RLUIPA. However, the Eighth Circuit has held that in order [t]o constitute a substantial burden, the government policy or action:
must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion."
Id. (citing Weir v. Nix, 114 F.3d 817, 820 (8th Cir.1997)).
The Court will address the Plaintiffs demands under the First Amendment and RLUIPA.
1. THE NEED TO HIRE OR APPOINT A SPECIFIC PIPE KEEPER
The Plaintiffs demand that the NDSP be required to hire or appoint a pipe keeper that meets the qualifications set forth by Chief Arvol Looking Horse. Again, Chief Looking Horse stated, "[t]hose that run this sacred rite should be able to communicate with Tuncasila (our Sacred Grandfathers) in their Native Plains tongue. They should also have earned this rite by completing [the Vision Quest] and the four days and four years of the [Sundance]." See Plaintiffs' Ex., p. 2. As previously discussed, the designated pipe keeper at the NDSP is Nelson White Tail, a member of the Arikara Nation. According to the Plaintiffs, White Tail does not meet the qualifications. The Plaintiffs contend that a failure to hire or appoint an individual that meets Chief Looking Horse's requirements constitutes a violation of their civil rights under the First Amendment and RLUIPA.
In what has become an oft-quoted footnote, the United States Supreme Court stated:
We do not suggest, of course, that every religious sect or group within a prison  however few in number  must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunity must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty.
Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972). From that, the Eighth Circuit has reasoned that "[t]he Constitution does not require that a religious advisor be provided for every sect represented in a penitentiary." Blair-Bey v. Nix, 963 F.2d 162, 163 (8th Cir.1992); see SapaNajin v. Gunter, 857 F.2d 463, 464-65 (8th Cir.1988) (holding "each inmate is not entitled to his own personal clergyman"). "Nor is a prisoner entitled to insist on a religious advisor whose beliefs are completely congruent with his own." Weir v. Nix, 114 F.3d 817, 820-21 (8th Cir.1997) (citing Blair-Bey, 963 F.2d 162, 163-64). "Rather, prisoners must simply be given a reasonable opportunity *1021 to exercise their religious freedom guaranteed by the First and Fourteenth Amendments." Blair-Bey, 963 F.2d 162, 164. "Only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner." Weir, 114 F.3d 817, 821 (citing SapaNajin, 857 F.2d 463, 464).
Numerous courts have denied claims similar to that of the Plaintiffs. See Werner v. McCotter, 49 F.3d 1476, 1481 (10th Cir.1995) (finding no substantial burden was imposed on a Cherokee inmate having to seek assistance from the penitentiary's two Lakota spiritual advisors); Ward v. Walsh, 1 F.3d 873, 880 (9th Cir.1993) (finding that prison has no affirmative obligation to hire an Orthadox rabbi to accommodate an inmate); Blair-Bey v. Nix, 963 F.2d 162, 163 (8th Cir.1992) (denying a prisoner's request to hire a second Islamic advisor from a different sect). Particularly persuasive is a case arising out of the District of Minnesota entitled Chambers v. Wood, No. CIV. 3-95-598, 1999 WL 33832661 (D.Minn. March 12, 1999), in which the court stated as follows:
Plaintiffs also challenge the lack of a Lakota / Dakota holy man at MCF-STW. Mr. Goggleeye, the Native American Holy Man hired by MCF-STW to provide religious services to the Native American population of the prison, is a member of the Ojibwa nation, as are all but 10 of the inmates at MCF-STW. Plaintiffs also request funding to be allocated for the purpose of hiring another holy man, in addition to Mr. Goggleye, of their choosing. Extensive case law supports the proposition that the DOC is not obligated to hire a separate religious services provider for separate sects of a religion, nor is it obligated to hire a full time religious services provider. Under the relevant law, the DOC has met its obligations by contracting with Mr. Goggleye to provide religious services. Blair-Bey v. Nix, 963 F.2d 162 (8th Cir.1992) (different but similar religions not entitled to separate providers); Butler-Bey v. Frey, 811 F.2d 449, 454 (8th Cir.1987) (no requirement that all sects be treated alike with regard to allocation of prison resources); Thompson v. Kentucky, 712 F.2d 1078 (6th Cir.1983) (not a violation or free exercise or equal protection that prison lacked full time Muslim religious provider). This is not to say that the DOC has refused to allow additional religious providers to be admitted. Defendants have expressed a willingness to allow volunteer religious counselors in addition to Mr. Goggleye to perform additional services. While such services may be very desirable, the state is under no legal obligation to seek out or provide people to perform them. See Benjamin v. Coughlin, 905 F.2d 571, 578 (2d Cir.1990); Gilmore-Bey v. Coughlin, 929 F.Supp. 146, 152 (S.D.N.Y.1996). Summary judgment on this issue should be granted.
Id. at *6.
However, certain instances may rise to a constitutional violation. In SapaNajin v. Gunter, 857 F.2d 463, 464-65 (8th Cir.1988), the Eighth Circuit upheld the finding of a First Amendment violation when a Sioux inmate was to attend religious ceremonies conducted by a Heyoka medicine man whose beliefs were diametrically opposed to his own. In the face of a constitutional violation, the Eighth Circuit concluded that "[t]he Court's solution of rotating a variety of different medicine men through the prison seems fair and calculated to meet the needs of the maximum number of inmates." Id.
Having carefully reviewed the relevant case law, the Court finds that the *1022 NDSP has not violated the Plaintiffs rights under the First Amendment or RLUIPA. As summarized above, the law in the Eighth Circuit is clear.
The Constitution does not ... require that a religious advisor be provided for every sect in a penitentiary. Nor is a prisoner entitled to insist on a religious advisor whose beliefs are completely congruent with his own. Only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner.
Weir v. Nix, 114 F.3d 817, 820-21 (8th Cir.1997) (citations omitted). Even when a prisoner's rights are substantially burdened, a prison is not under an affirmative duty to hire a particular clergy person. An appropriate solution can include rotating different clergy in an effort to cater to all sects. See SapaNajin v. Gunter, 857 F.2d 463, 464-65 (8th Cir.1988); Chambers v. Wood, No. CIV. 3-95-598, 1999 WL 33832661 (D.Minn. March 12, 1999).
In the present case, the facts do not support the Plaintiffs' contention that their civil rights are being violated. The following facts are undisputed: (1) sweat lodge ceremonies are conducted twice a week at the penitentiary; (2) no one is restricted from leading the sweat lodge ceremonies, including Joe Brown; (3) several inmates, representative of the different nations or tribes, lead the ceremony on a rotating basis; (4) NDSP records indicate that Joe Brown was the designated pipe keeper on at least twenty-four occasions between July 16, 2003, and August 29, 2004;[9] (5) Native American religious leaders from different tribes outside the prison, such as Cedric Goodhouse, John Buckley, and Wendell White Eyes, are brought in to participate in the religious activities; (4) Chief Arvol Looking Horse has been contacted on at least two occasions regarding the sweat lodge ceremony as it is conducted at the penitentiary. See Affidavit of David L. Vaughn, ¶¶ 4-5.
In addition, the Court is persuaded by the affidavit of Cedric Goodhouse, a member of the Hunk Pa Pa Band of Oceti Sakowin and Lakota Nation. Goodhouse has practiced Lakota traditions, to include all Seven Sacred Rites, since 1979. He has conducted sweat lodge ceremonies and assisted the NDSP in creating its sweat lodge in the early 1980's. Goodhouse is also a member of the Wakicuza, a council of men who work to insure the sanctity and integrity of Native American ceremonies. See Affidavit of Cedric Goodhouse, ¶ 2.
With regard to the Looking Horse pronouncements, Goodhouse states as follows:
I attended the Protection of Ceremonies meeting in Eagle Butte, South Dakota on March 8-9, 2003, and other meetings held for the same purpose. Chief Arvol Looking Horse's statement of protocols for the Seven Sacred Rites should be understood in the context in which it was made. It was intended as guidance to protect the Seven Sacred Rites from abuse and exploitation in free society. Inipi ceremonies in prisons present other problems which were not considered due to laws and regulations governing *1023 participants. The protocols stated are intended to serve as goals. A failure to meet the goals may not deprive the ceremonies of meaning.
See Affidavit of Cedric Goodhouse, ¶ 3.
The Court finds that there are no genuine issues of material fact with regard to the Plaintiffs' claim under the First Amendment and RLUIPA that there is a need to hire or appoint a specific pipe keeper. The failure to do so in this case does not impose a substantial burden on the Plaintiffs' exercise of their religious freedoms. It is clear and undisputed that the Plaintiffs have been afforded a reasonable opportunity to exercise their religious freedoms as guaranteed by the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act.
2. THE DISALLOWANCE OF NON-NATIVE AMERICANS
In furtherance of the Chief Looking Horse protocols, the Plaintiffs also seek to prohibit the attendance of non-Native Americans at the sweat lodge ceremonies. As stated by Chief Looking Horse, "from March 9th, 2003 and forward, there will be no non-Natives allowed in our sacred Hocoka (our sacred alters) where it involves our Seven Sacred Rites." See Plaintiffs' Ex. 14, p. 1. The Plaintiffs again assert this claim under the First Amendment and RLUIPA.
While the Plaintiffs contend that the NDSP policy of allowing all inmates to attend the sweat lodge ceremony is unlawful, the Court is not convinced that is an accurate statement of the law. In Combs v. Corrections Corp. of America, 977 F.Supp. 799, 800-801 (W.D.La.1997), inmates brought an action under 42 U.S.C. § 1983 challenging the prison's policy of restricting participation in Native American religious programming to Native American inmates. The inmates challenged the policy, in part, as a violation of their free exercise rights under the First Amendment. The Court enjoined the prison from enforcing the policy, stating as follows:
In this case, we hold that the defendants have not demonstrated a reasonable relation to a legitimate penological interest in restricting the practice of the Native American Religion only to those prisoners of Native American ancestry. The WCC policy offends the fundamental constitutional right to practice religion of one's choice. The policy is akin to a requirement that practicing Catholics prove an Italian ancestry, or that Muslims trace their roots to Mohammed. Under the Constitution, the freedom to believe, or not to believe, in a religious faith is reserved not to a select class of citizens, but to all. The defendants are enjoined from restricting the practice of the Native American Religion to those who can demonstrate a BIA number or Native American ancestry.

. . . . .
In sum, the ethnicity test prescribed by WCC for religious practice does not pass constitutional muster.
Id. at 802-803; see Morrison v. Garraghty, 239 F.3d 648, 657-59 (4th Cir.2001) ("[W]e agree with the district court's conclusion that prison officials cannot measure the sincerity of Morrison's religious belief in Native American Spirituality solely by his racial make-up or the lack of his tribal membership"); Mitchell v. Angelone, 82 F.Supp.2d 485, 492 (E.D.Va.1999) ("The Defendants' equivocal evidence that some tribes would not welcome Non-Native Americans at some ceremonies does not address whether Non-Native Americans have a sincere faith in the creeds and beliefs that animate these ceremonies.... Defendants' refusal to acknowledge that sincere belief in Native American theology is not absolutely limited to individuals with *1024 a certain percentage of Native American blood defies common sense and precedent").
Following Combs, the Court expressly finds that NDSP officials would be prohibited under the First Amendment from adopting a policy that prevented non-Native Americans from attending the sweat lodge ceremony. Such a policy would not withstand constitutional muster and would offend the fundamental constitutional right to practice religion of one's choice whether Native American or non-Native American. Therefore, there is no legal basis to order the implementation of such a discriminatory policy at the North Dakota State Penitentiary. The Court finds that there are no genuine issues of material fact concerning the Plaintiffs' claim under the First Amendment and RLUIPA to prevent non-Native Americans from attending the sweat lodge ceremonies.
III. CONCLUSION
For the reasons outlined above, the Court GRANTS the Defendant's Motion to Dismiss or, in the alternative for Summary Judgment. (Docket No. 21).
IT IS SO ORDERED.
NOTES
[1] This statistic is accurate as of October 1, 2004. See Affidavit of David L. Vaughn, ¶ 3.
[2] It should be made clear that the grievance merely requested reinstatement regarding the "setting up of the sweat lodge." No mention was made, in either the original memorandum dated August 1, 2002, or the grievance dated August 15, 2002, regarding Brown's ability or inability to conduct the sweat lodge ceremony.
[3] The Seven Sacred Rites include the following: Inipi (Purification Ceremony); Wiwanyang Wacipi (Sundance Ceremony); Hanbleciya (Vision Quest); Hunka Kaga (Making of a Relative); Tapa Kahgoya (Throwing of the Sacred Ball); Wiyan Isna Ti (Womanhood Ceremony); and the Nagi Gluha (Keeping of the Spirit Ceremony).
[4] Attached to the memorandum was a list of approximately twenty-five signatures of members of the Native American Indian Culture Group. See Plaintiffs' Ex. 15.
[5] On July 17, 2003, Patrick Branson, the Deputy Warden of Operations, also responded to the requests wherein he concurred with Warden Schuetzle's decision. See Plaintiffs' Ex. 22.
[6] The action was purportedly filed on behalf of all indigenous inmates at the NDSP. In an attempt to satisfy Rule 23 of the Federal Rules of Civil Procedure, the Plaintiffs filed a "Memorandum In Support of Complaint," wherein the Plaintiffs include a one-page "Request for Certification as a Class." The request merely lists the requirements of Rule 23, with no attempt to satisfy each element. The Court is in no position to certify a class based on the brief request alluded to in the Memorandum in Support of Complaint.
[7] In construing the Plaintiffs' complaint broadly the Court is sympathetic to the fact that the Plaintiffs are proceeding in this matter pro se. The Plaintiffs state in their reply brief that they "do not understand the issue of ripeness even after reading [the Defendant's] claims."
[8] This section only applies when "the substantial burden is imposed in a program or activity receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." The Defendants have not challenged the applicability of RLUIPA, therefore the Court will operate under the assumption that it applies.
[9] It should be noted that the NDSP records are often unclear as to who was pipe keeper at any given ceremony. On certain dates, the records indicate that the pipe keeper is "unknown" or "don't remember." Furthermore, over the relevant time period there are numerous occasions where the sweat lodge ceremony was cancelled. Therefore, the figure recited by the Court may in fact under represent the actual number of times, or frequency at which, Joe Brown conducted the sweat lodge ceremony as pipe keeper. See Defendants' Ex. "A".