# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2741

_____

|  |  |  |
|---|---|---|
| Americans United for Separation of Church and State, et al., | * * * | |
| Appellees, | * | |
| v. | * * * | Appeal from the United States District Court for the Southern District of Iowa. |
| Prison Fellowship Ministries, Inc., et al., | * * * | |
| Appellants. | * | |

_____

Submitted: February 13, 2007
Filed: December 3, 2007

_____

Before O'CONNOR, Associate Justice (Ret.),[1] WOLLMAN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Prison Fellowship Ministries, Inc., InnerChange Freedom Initiatives, Inc., and employees of the Iowa Department of Corrections in their official capacities (DOC), appeal the declaratory judgment and equitable relief entered in favor of Americans United for Separation of Church and State, individual inmates, contributors to the

_____

[1]The Honorable Sandra Day O'Connor, Associate Justice, Supreme Court of the United States (Ret.), sitting by designation.

inmates' telephone accounts, and an Iowa taxpayer. ***Ams. United for Separation of Church and State v. Prison Fellowship Ministries***, 432 F. Supp. 2d 862 (S.D. Iowa 2006). Having jurisdiction under 28 U.S.C. § 1291, this court affirms in part, reverses in part, and remands.

I.

After a bench trial, this court reviews *de novo* legal conclusions and mixed questions of law and fact. ***Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.***, 48 F.3d 365, 369 (8th Cir. 1995). Factual findings are reviewed for clear error. ***Robinson v. GEICO Gen. Ins. Co.***, 447 F.3d 1096, 1101 (8th Cir. 2006). Further, a

> reviewing court oversteps the bounds of its duty under [Federal Rule of Civil Procedure] 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*."

***Anderson v. City of Bessemer City***, 470 U.S. 564, 573 (1985), *quoting **Zenith Radio Corp. v. Hazeltine Research, Inc**.*, 395 U.S. 100, 123 (1969).

A.

InnerChange offers a residential inmate program within the Newton, Iowa, medium-security facility. InnerChange, and its affiliate Prison Fellowship, are non-profit 501(c)(3) corporations. From September 1, 1999 to June 30, 2007, the InnerChange program was funded in part by Iowa.

The purposes of InnerChange are: "Reduce the rate of re-offense and the resulting societal costs" and "Provide a positive influence in prison." InnerChange's "ultimate goal" is "to see ex-prisoners become contributing members of society, by

becoming responsible leaders in their family, church and community." InnerChange, a Christian program, describes itself as "an intensive, voluntary, faith-based program of work and study within a loving community that promotes transformation from the inside out through the miraculous power of God's love. [InnerChange] is committed to Christ and the Bible. We try to base everything we do on biblical truth." Further, "Biblical principles are integrated into the entire course curriculum of [InnerChange], rather than compartmentalized in specific classes. In other words, the application of Biblical principles is not an agenda item – it is the agenda." The DOC has no control over the selection or teaching of the InnerChange curriculum or personnel.[2]

The program is quartered in Newton's Unit E. This Unit, due to construction budget constraints, has wooden cell doors to which inmates have keys, and community bathrooms with privacy dividers (thus, "dry" cells). Before InnerChange's use, Unit E housed honor inmates. Building M at Newton also is used only by InnerChange. Building M has offices, classrooms, a computer room, a library, and a multi-purpose room, but no security cameras.

Inmates are not required to join InnerChange. No one from the DOC or InnerChange threatens punishment, reduction in privileges, or otherwise pressures inmates to participate. If inmates join, no one from the DOC or InnerChange promises a reduced sentence or earlier parole. When joining, an inmate confirms in writing that

___

[2]Prison Fellowship and InnerChange assert the district court erred in admitting testimony from a law professor/Ph.D./author to describe "Evangelical Christianity." 432 F. Supp. 2d at 872-74. An inquiry into an organization's religious views to determine if it is pervasively sectarian "is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion); *see also Employment Div. v. Smith*, 494 U.S. 872, 887 (1990). The district court abused its discretion, as the professor's testimony is not relevant. *See* **Fed. R. Evid. 402**. However, in light of Prison Fellowship and InnerChange's sincere statements of their beliefs, this error is harmless.

participation is voluntary and will not affect eligibility for parole. The mandatory statement adds that the program is based on Christian values and contains religious content, but an inmate need not be a Christian to participate. Also, discontinuation may be voluntary or involuntary, and the inmate will not be penalized for voluntary withdrawal.

Iowa inmates are introduced to the program through presentations by InnerChange personnel at the various DOC institutions. The Introduction Workbook uses the Christian Bible to illustrate civic values. For example, the workbook includes Saul's conversion on the road to Damascus, Jesus' choosing of the apostles, and the parable of the Good Samaritan. It also contains Bible studies, such as *Do You Know Jesus Personally?*; *Salvation*; and *Answered Prayer*. An inmate may be eligible for InnerChange after completion of the introductory program. There is a substantial inmate waiting list eligible to join InnerChange (146 inmates as of October 2003).

InnerChange begins with a four-week orientation, followed by Phases I through IV. According to the orientation materials, InnerChange "is a Christian program, with a heavy emphasis on Christ and the Bible. All the components of the program are based on a biblical worldview. You will be expected to attend all [InnerChange] programming, including religious services." Further:

> We believe that the root of our transformation is a spiritual change. [InnerChange] is designed intentionally to help produce and nurture spiritual change in you. We focus on relationship with God and how that spreads to other relationships. We study the Bible a lot. The Bible is God's revealed truth to us. Jesus said, "If you hold to my teachings, you are my disciples. Then you will know the truth, and the truth will set *you free!*" (John 8:31-32) That is the kind of transformation we are talking about.

Orientation materials contain introductory Bible studies and state that each InnerChange class is led by a biblical counselor who coaches the inmate in biblical living.

After orientation, to continue to Phase I, an inmate must sign the InnerChange Accountability Covenant, which states:

> I understand that the principles in Matthew 18:12-35 will be applied to my life within the [InnerChange] community.
>
> Those principles are
>
> 1. Error leads us to danger (vs. 12)
> 2. The heart of correction is to restore (vs. 13, 14)
> 3. It is the responsibility for those involved to reconcile on an interpersonal level (vs. 15)
> 4. Peer mediation is to be utilized if necessary (vs. 16)
> 5. Removal from the community is a last resort (vs. 17)
> 6. Conflict resolution builds a stronger community (vs. 18-20)
> 7. Interpersonal forgiveness of others is a condition of personal forgiveness from God. (vs. 21-35)
>
> I have read, understand, and will adhere to the above principles as a condition of my participation in the [InnerChange] program.

Each day in Phase I, which lasts 12 months, opens with a 30-minute devotional where inmates pray and read aloud from Christian scripture. Required classes fill the day, with homework, including memorization of Bible verses. Classes are followed by an afternoon community meeting. There, inmates pray, make prayer requests, sing religious songs, read from the Bible, and hear a daily devotional message (by an InnerChange inmate). Evening classes begin after dinner. Friday evenings, a revival service is held; all inmate participants are required to attend and take their

InnerChange-provided Bibles. Sunday mornings, InnerChange holds church services, which all program inmates must attend.

During the typical day in Phase I, an inmate has five or six periods of free time, each lasting between 30 minutes and an hour. The DOC admits that during free time, InnerChange inmates are allowed to use computers, but other Newton inmates are not.

After completing Phase I, the inmate may enter Phase II, which lasts six months. The inmate signs a Continued Stay Agreement, to continue participation in the same basic schedule of morning devotionals, community meetings, afternoon and evening classes, Friday evening revivals, and Sunday morning services. By signing this agreement, the inmate understands that "if I fail to maintain these expectations I will be subject to disciplinary actions." In Phase II, the inmate also is assigned an InnerChange volunteer mentor, who assists the inmate in "living the Christian life."

InnerChange's curriculum in Phases I and II include several mandatory religious classes, such as Experiencing God, Old and New Testament Survey, and Spiritual Freedom. InnerChange also has treatment classes, such as Substance Abuse, Anger Management, Victim Impact, Criminal Thinking, Financial Management, Family Series,[3] and Marriage/Family/Parenting. InnerChange's treatment classes have religious content. For example, InnerChange affirms that its (licensed) substance abuse curriculum contains a high level of religious content, based on the premise that "only Jesus Christ is the cure for addiction." Anger Management goals include learning how biblical power works and how to apply it. The Criminal Thinking course has four goals, each comparing and contrasting secular concepts to superior

---

[3]The district court found that during the three months of this course, an InnerChange inmate receives "more visits than he otherwise would be allowed," allowing "greater exposure to loved ones than he would otherwise have without the programming."

biblical truth and Christian ethics.  The only thoroughly secular course is Computer Training, which meets two hours each week.

To measure progress in Phases I and II, InnerChange used a "Fruit of the Spirit" evaluation.  (In 2005, this form was changed to a Quarterly Goals Review based upon civic virtues.)  This evaluation rated the inmate's progress based on characteristics in Galatians 5:13-26.  An inmate's failure to meet expectations, or low Fruit of the Spirit score, could result in dismissal from InnerChange.  For example, in dismissing one inmate, the entire treatment team met and discussed his progress, concluding:

> your conduct has been excellent according to security standards, and you are a hard worker.  With you as a member you have always completed your work and assignments, however, you are not displaying the growth needed to remain in the program.  Your Focus is not on God and His Son to Change you.

(No discipline was imposed on this inmate upon dismissal from InnerChange.)  Most dismissals, however, were the result of minor infractions and attitudinal deficiencies.

Additionally, InnerChange staff, without DOC personnel, supervise inmates in classes, activities, and recreation.  The DOC has authorized InnerChange staff to write and issue a disciplinary "behavior report" on a participating inmate.  After seven reports, the inmate receives, from a DOC officer, a "major report," indicating a serious rule violation.  The inmates who testified at trial stated that InnerChange staff possess many of the same duties as corrections personnel.

After Phase II, if the DOC places a participating inmate in a work release center, he may enter Phase III.  Phase IV begins if an InnerChange inmate is released from confinement.  During these Phases, the inmate is required to stay employed and attend church each Sunday and at mid-week (at the church agreed to by InnerChange, for the first three months after release).

B.

The contractual and monetary relationship between Prison Fellowship, InnerChange, and the DOC developed over a number of years. In 1997, the new Newton facility faced budgetary restraints, overcrowding, and lack of appropriate programs. Prison administrators rank effective programs a close second to overcrowding in addressing prisoner security and safety concerns. Corrections officials searched for innovative ways to meet programing needs. An InnerChange program in Texas was examined to determine if it would work at Newton. A search also was conducted for other organizations with similar services. Although there were several providers of values-based programing, InnerChange was the only organization officials found that offered a long-term, values-based, residential program with excellent post-release services.

Officials were concerned with the constitutionality of InnerChange's religious model but concluded, due to budgetary constraints, that it was the only way to provide necessary programing. If the budget allowed, corrections officials gladly would offer a broader spectrum of values-based programing. InnerChange's volunteers and donors enable it to provide in-prison and post-release programing at a greatly reduced cost to the state.

In 1998, Iowa's General Services Department publicly issued a request for proposals to establish a non-compensated, values-based, pre-release program at Newton. Prison Fellowship and InnerChange, jointly, submitted the only proposal. Their submission, however, sought partial state funding. The DOC accepted the proposal.

In March 1999, Prison Fellowship, InnerChange and the DOC contracted for program services, with reimbursement for non-religious costs and expenses. Under an extension clause, the contract covered September 1999 to June 2002. In the first

year of the contract, the DOC paid InnerChange $229,950, with all the money coming from the Inmate Telephone Rebate Fund. (In 2003, the law was amended to delete the term "Rebate.") By statute and regulation, expenditures from this fund are at the discretion of the DOC for the benefit of inmates. **Iowa Code § 904.508A; Iowa Admin. Code r. 201-20.20(1)-(5)**. In the contract's second year, the DOC paid InnerChange $191,625 from the same fund. InnerChange's operating costs at Newton were $506,181 the second year. In the third year, InnerChange was paid $191,625 from the fund toward its operating cost of $578,995.

Nearing the expiration of the contract in 2002, the General Services Department issued a request for proposals to the general public to continue a values-based, pre-release program at Newton. InnerChange submitted the only proposal, again accepted by the DOC (with Prison Fellowship no longer a party to the contract).

A contract was entered, renewable for one-year terms from July 2002 to June 2005. It provided state funding for the non-religious parts of the program. In the contract's first year, 2002 to 2003, InnerChange's operating expense was $603,063. The DOC paid InnerChange $191,625 from the Telephone Rebate Fund. This was the last year that rebate funds were paid to InnerChange. Additionally that year, the Iowa legislature appropriated $172,591 to the DOC "for a values-based treatment program at the Newton correctional facility." This appropriation was used to expand the InnerChange program to the Release Center at Newton (a minimum-security facility one mile from the main facility). The appropriation came from the Healthy Iowans Tobacco Trust (proceeds from the master tobacco settlement between the state and tobacco manufacturers). During the contract's second year, 2003 to 2004, the legislature appropriated $310,000 from the Tobacco Trust. Actual payment from the Trust to the DOC for InnerChange was $276,909. The program's operating cost was $670,382. In the third year, 2004 to 2005, the contract was changed to a per diem payment of $3.47 for each inmate participating in the program. The legislature again appropriated $310,000, with actual payment to InnerChange of $236,532.55. InnerChange's operating costs were $687,655.

In April 2005, the DOC issued the last request for proposals to continue the values-based, pre-release program at Newton. Two organizations responded, InnerChange and Emerald Correctional Management - a non-religious service provider. InnerChange's proposal of $310,000 for a full array of services, including a licensed substance abuse program, was lower than Emerald's bid of $562,000. The DOC accepted InnerChange's proposal. In the contract's first and second years, July 2005 to June 2007, the legislature appropriated $310,000 each year. In June 2007, the legislature refused to make a further appropriation. In accordance with the contract extension for 2007-2008, the InnerChange program is operating without state funds.

C.

Until July 2007, the DOC's funding accounted for 30 to 40 percent of InnerChange's operating costs. The contracts at issue mandated that government funds cover only "the non-religious aspects," or "the non-sectarian portion." The district court found that no clear understanding or definition of non-religious costs was developed. From the first billing (September 1999 to April 2000), the DOC expressed concern about InnerChange's designation of religious and non-religious costs, but paid the billed amount. After reviewing the contract, the DOC Director for Offender Services concluded that "the contract doesn't get very specific about what kinds of expenses are billable." In 2001, the DOC services director called for a clear definition of religious versus non-religious expenses. (At trial, the director testified that the definition was not ever resolved.) The services director informed DOC officials and InnerChange that billing was generalized and did not detail why expenses were characterized as non-religious. Despite this ambiguity, the Newton warden testified that InnerChange gave Iowa far more value in non-religious programs than it paid for.

Salaries and benefits for InnerChange's personnel were paid by the DOC on a percentage basis. The state paid 82% of the Local Director's salary; 9% for the

Program Manager; 93% for the Aftercare Manager; 77% for the Office Administrator; and 16% for each of four Biblical Counselors (also called Case Workers). InnerChange staff did not actually divide their work time into religious or non-religious activities or make any allocation for payroll purposes. The percentages billed by InnerChange were identical for every period (until payment changed to per diem).

As for other expenses, the InnerChange Office Administrator recorded items as religious or non-religious. Items designated as non-religious were billed to and paid for by the DOC. For example, InnerChange's volunteer-recruitment brochure, *A Prison Like No Other*, was printed completely at state expense. The brochure describes InnerChange as a "24-hour-a-day, Christ-centered, biblically based, program that promotes personal transformation of prisoners through the power of the Gospel." It represents the program as immersing "prisoner-participants in round-the-clock, Christ-centered programming" and advancing the state's objectives of rehabilitation and recidivism reduction "with everything grounded in the Word of God." The brochure states:

> The InnerChange Freedom Initiative is our chance to demonstrate, in a way secular people will never be able to doubt, that Christ changes lives, and that changing prisoners from the inside out is the *only* crime-prevention program that really works.

At various times, the DOC paid for small religious gifts - key rings and bookmarks - to volunteers and graduating inmates; a subscription to a monthly Christian devotional booklet; and a "Church Copyright License" to use religious music in worship. Additionally, all land and cell phone costs were billed to the DOC. InnerChange's postal meter and thermal tape were billed to the state without detailed accounting. The DOC paid for InnerChange's computer hardware, software, repair, and internet account. The DOC also paid for InnerChange's letterhead, envelopes, printer and copier toner, paper, blank videotapes, and standard office supplies. Each

month, every photocopy up to 40,000 was charged to the DOC. Copies over 40,000 were designated as religious (although the record does not reflect how many total copies were made each month).

Building M – a modular building housing InnerChange's offices and classrooms – was constructed in 2000. By the lease-purchase contract, the Telephone Fund paid $294,017 for Building M, with ownership in the DOC since 2002.

When the DOC reimbursed InnerChange for costs or paid the per diem amount, the money was deposited in InnerChange's bank account. From that account, InnerChange periodically transferred funds to Prison Fellowship's general accounts, to cover program operating expenses. These general accounts also contain funds from private sources.

## II.

### A.

Issues of standing arise throughout this case. There are two strands in standing jurisprudence: "Article III standing, which enforces the Constitution's case-or-controversy requirement; and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004) (internal citations and quotation marks omitted). "Article III of the Constitution limits the judicial power of the United States to the resolution of Cases and Controversies, and Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Hein v. Freedom from Religion Found., Inc.*, __ U.S. __, __, 127 S. Ct. 2553, 2562 (2007), *quoting DaimlerChrysler Corp. v. Cuno*, 547 U.S. __, __, 126 S. Ct. 1854, 1861 (2006) (internal quotation marks omitted). "The requisite elements of Article III standing are well established: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly

-12-

unlawful conduct and likely to be redressed by the requested relief." *Id.*, *quoting*
*Allen v. Wright*, 468 U.S. 737, 751 (1984).

In the present case, there are four categories of plaintiffs: inmates, Americans
United, an Iowa taxpayer, and contributors to inmates' telephone accounts (who are
also former cigarette smokers). First, the inmates allege they altered their behavior
and had direct, offensive, and alienating contact with the InnerChange program. *See*
*ACLU Neb. Found. v. City of Plattsmouth*, 358 F.3d 1020, 1030 (8th Cir. 2004),
*adopted by court en banc*, *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772,
775 n.4 (8th Cir. 2005). An injunction can remedy this injury. The inmates have
standing.

Next, Americans United has standing if "(a) its members would otherwise have
standing to sue in their own right; (b) the interests it seeks to protect are germane to
the organization's purpose; and (c) neither the claim asserted nor the relief requested
requires the participation of individual members in the lawsuit." *Hunt v. Wash. State*
*Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The second and third factors are
not disputed.

Regarding the first factor, Americans United bases its members' standing on
Iowa taxpayer status, as does the individual taxpayer plaintiff. Generally, the interest
of a "taxpayer in seeing that Treasury funds are spent in accordance with the
Constitution does not give rise to the kind of redressable 'personal injury' required for
Article III standing." *Hein*, __ U.S. at __, 127 S. Ct. at 2563.

> Because the interests of the taxpayer are, in essence, the interests of the
> public-at-large, deciding a constitutional claim based solely on taxpayer
> standing "would be[,] not to decide a judicial controversy, but to assume
> a position of authority over the governmental acts of another and co-
> equal department, an authority which plainly we do not possess."

*Id.*, *quoting Frothingham v. Mellon*, 262 U.S. 447, 489 (1923) (alteration in original). There is, however, "a narrow exception to the general constitutional prohibition against taxpayer standing." *Id.* at 2564, *citing Flast v. Cohen*, 392 U.S. 83 (1968). The exception provides that "'a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of' the Establishment Clause." *DaimlerChrysler Corp.*, 547 U.S. at \_\_, 126 S. Ct. at 1864, *quoting Flast*, 392 U.S. at 105-06. This exception also applies to state taxpayer challenges of state expenditures contrary to the Establishment Clause. *See Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952); *Minn. Fed'n of Teachers v. Randall*, 891 F.2d 1354, 1356-58 (8th Cir. 1989).

In this case, the Iowa legislature made specific appropriations from public funds "for a values-based treatment program at the Newton correctional facility" when InnerChange solely provided the program. *See Hein*, \_\_ U.S. at \_\_, 127 S. Ct. at 2565 (in *Flast*, the acts and expenditures warranting taxpayer standing were by express legislative mandate and appropriation). Therefore, Americans United and the individual taxpayer satisfy the narrow exception for taxpayer standing.

Finally, as for the non-inmate contributors to inmates' telephone accounts, each paid money to a telephone account to permit an inmate to make calls. The profit or commission generated from the telephone vendor was deposited in the Inmate Telephone Fund, specifically authorized by Iowa statute. The non-inmates' payment was a charge "correlated to a particular benefit . . . exacted in exchange for a benefit of which the payor has voluntarily availed itself . . . based on the cost of providing a benefit to the recipient." *Coal. for Fair & Equitable Regulations v. F.E.R.C.*, 297 F.3d 771, 778-79 (8th Cir. 2002). The non-inmates' payments to the Telephone Fund were thus voluntary fees, not taxes. *Id.* The payments were not a pass-through tax, or a "mandatory" fee, as involved in the cases cited by the plaintiffs. *See Freedom from Religion Found., Inc. v. Bugher*, 249 F.3d 606, 610 (7th Cir. 2001). *See also*

*United States v. United Foods, Inc.*, 533 U.S. 405, 408 (2001); *Bd. of Regents v. Southworth*, 529 U.S. 217, 221 (2000); *Keller v. State Bar*, 496 U.S. 1, 4 (1990); *Lemon v. Kurtzman*, 403 U.S. 602, 611, 616 (1971).  Therefore, the non-inmate fee-payers to the Telephone Fund do not have taxpayer standing.  Prison Fellowship, InnerChange, and the DOC's motion for partial dismissal, as to standing, is denied, except as to the non-inmate contributors to the Telephone Fund.

B.

Closely related to standing is mootness.  Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies.  *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000).  The controversy must exist throughout the litigation; otherwise, the case is moot.  *Id.*  Federal courts lack power to decide the merits of a moot case.  *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 484 (8th Cir. 1998).

Prison Fellowship, InnerChange, and the DOC contend that any challenge to the fully performed contracts is moot.  They cite several cases holding that if a litigant seeks an injunction against performance of a contract – and before the injunction is entered, the contract is fully performed – the request for injunctive relief is moot, as the court cannot enjoin completed performance.  *See, e.g., Agrigenetics, Inc. v. Rose*, 62 F.3d 268, 270-71 (8th Cir. 1995); *Curtis Indus., Inc. v. Livingston*, 30 F.3d 96, 97 (8th Cir. 1994); *Fauconniere Mfg. Corp. v. Sec'y of Def.*, 794 F.2d 350, 351 (8th Cir. 1986).  This reasoning does not apply here.  The district court did not enjoin already concluded contracts.  Instead, it only addressed *further* operation of InnerChange's program at Newton.  Additionally, the dispute as to restitution, premised on the unconstitutionality of the performed contracts, is a live controversy.

Prison Fellowship, InnerChange, and the DOC next move to dismiss all Establishment challenges to the per diem payment structure, arguing such challenges

are moot because the program has not been funded since July 1, 2007. To the contrary, the voluntary cessation exception to mootness applies. "[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Prison Fellowship, InnerChange, and the DOC object, asserting that the relevant de-funding action was by the Iowa legislature, not the defendants, and the funding expired by its own terms. However, InnerChange and the DOC did act by agreeing to the contract extension that deleted funding from Iowa.

Prison Fellowship, InnerChange, and the DOC contend that Americans United has not successfully demonstrated potential recurrence of the unlawful action. This argument misplaces the burden of showing the likelihood of recurrence. "The defendant faces a heavy burden of showing that 'the challenged conduct cannot reasonably be expected to start up again.'" *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006), *quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). Prison Fellowship, InnerChange, and the DOC have not met this burden. They effectively ask this court to vacate the injunction without any assurance that they will not resume the prohibited conduct. Therefore, under the voluntary cessation exception, the district court's injunctive relief is not moot.

Finally, the cessation of government funding does not render moot the live controversy about recoupment of previous payments (discussed below in Section II.G). Prison Fellowship, InnerChange, and the DOC's motion for partial dismissal, as it concerns mootness, is denied.

## C.

Prison Fellowship and InnerChange assert they are not actors under color of state law for purposes of 42 U.S.C. § 1983. "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how

discriminatory or wrongful.'" ***Am. Mfrs. Mut. Ins. Co. v. Sullivan***, 526 U.S. 40, 50 (1999), *quoting* ***Blum v. Yaretsky***, 457 U.S. 991, 1002 (1982). However, "[i]n certain circumstances the government may become so entangled in private conduct that 'the deed of an ostensibly private organization or individual is to be treated . . . as if a State had caused it to be performed.'" ***Wickersham v. City of Columbia***, 481 F.3d 591, 597 (8th Cir. 2007), *quoting* ***Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n***, 531 U.S. 288, 295 (2001).

The issue is whether "the alleged infringement of federal rights [is] 'fairly attributable to the State.'" ***Rendell-Baker v. Kohn***, 457 U.S. 830, 838 (1982), *quoting* ***Lugar v. Edmondson Oil Co., Inc.***, 457 U.S. 922, 937 (1982). *See also* ***West v. Atkins***, 487 U.S. 53, 54 (1988) (contract physician's medical care of a state inmate is conduct "fairly attributable to the State"). Thus, "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." ***Brentwood Acad.***, 531 U.S. at 295 (internal citation and quotation marks omitted). A two-part approach determines whether there is state action:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar,* 457 U.S. at 937.

Regarding the first part, the alleged deprivation is a violation of the Establishment Clause. This violation is possible because of privileges created by the DOC in its contracts with Prison Fellowship and InnerChange. The DOC gave Prison

-17-

Fellowship and InnerChange access to facilities, control of prisoners, and substantial aid to effectuate the program. Thus, the privilege to Prison Fellowship and InnerChange was created by the state. *Id.*; *but cf. **Montano v. Hedgepeth***, 120 F.3d 844, 848-51 (8th Cir. 1997) (in free-exercise challenge, prison chaplain's religious acts were beyond governmental authority and could not fairly be attributed to the state).

The second, critical inquiry is whether Prison Fellowship and InnerChange can properly be classified as state actors. The Supreme Court has recognized a number of circumstances under which this requirement can be met, but "[t]he one unyielding requirement is that there be a 'close nexus' not merely between the state and the private party, but between the state and the alleged deprivation itself." ***Wickersham***, 481 F.3d at 597, *citing **Brentwood Acad.***, 531 U.S. at 295. One way a private party can appropriately be characterized as a state actor is when it is "a willful participant in joint activity with the State or its agents." ***Adickes v. S. H. Kress & Co.***, 398 U.S. 144, 152 (1970) (internal quotation marks omitted). However, the state's mere acquiescence in a private party's actions is not sufficient. ***Wickersham***, 481 F.3d at 597, *citing **Blum***, 457 U.S. at 1004-05.

In this case, the state effectively gave InnerChange its 24-hour power to incarcerate, treat, and discipline inmates. InnerChange teachers and counselors are authorized to issue inmate disciplinary reports, and progressive discipline is effectuated in concert with the DOC. Prison Fellowship and InnerChange acted jointly with the DOC and can be classified as state actors under § 1983. *See **Corr. Servs. Corp. v. Malesko***, 534 U.S. 61, 71-72 n.5 (2001) ("the private facility in question housed *state* prisoners – prisoners who already enjoy a right of action against private correctional providers under 42 U.S.C. § 1983"); ***Smith v. Cochran***, 339 F.3d 1205, 1215-16 (10th Cir. 2003) ("persons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable for violations of the Eighth Amendment" in a § 1983 action); ***Street v. Corr. Corp. of***

***Am.***, 102 F.3d 810, 814 (6th Cir. 1996) (a private prisoner operator acted under color of state law).

In this case, Prison Fellowship and InnerChange are appropriate parties under 42 U.S.C. § 1983.

D.

On the merits, the plaintiffs invoke the Establishment Clause of the First Amendment, as applied to the states through the Fourteenth Amendment. *See **Santa Fe Indep. Sch. Dist. v. Doe***, 530 U.S. 290, 301 (2000). Also involved is the establishment clause of the Iowa Constitution, which is analyzed simultaneously. *See **Kliebenstein v. Iowa Conference of the United Methodist Church***, 663 N.W.2d 404, 406-07 (Iowa 2003). The Establishment Clause erects a barrier between government and religious entities "'depending on all the circumstances of a particular relationship.'" ***Lynch v. Donnelly***, 465 U.S. 668, 678-79 (1984), *quoting **Lemon v. Kurtzman***, 403 U.S. 602, 614 (1971); *see **McCreary County v. Am. Civ. Liberties Union***, 545 U.S. 844, 867 (2005) ("under the Establishment Clause detail is key"). For those "who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." ***Walz v. Tax Comm'n***, 397 U.S. 664, 668 (1970). "In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed." ***Lynch***, 465 U.S. at 678. "In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the [Supreme] Court." ***Id.*** Instead, a court should scrutinize "challenged legislation or official conduct to determine whether, *in reality, it establishes a religion or religious faith, or tends to do so.*" ***Id.*** (emphasis added).

For the contract years 2000 to 2004, Iowa made payments directly to InnerChange. In determining whether this direct aid violates the Establishment Clause, this court must "ask whether the government acted with the purpose of advancing or inhibiting religion, and . . . whether the aid has the effect of advancing or inhibiting religion." *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997) (internal citations and quotation marks omitted).

In the present case, the district court concluded that the DOC's purpose in contracting with and funding InnerChange was secular: offering comprehensive programing to inmates and reducing recidivism. This conclusion is well-supported. The DOC officials were "confronted with the secular, pragmatic needs of running a state prison facility with sufficient programming in a tight budgetary environment." The DOC officials "considered the long term nature of the InnerChange program, its supportive communal environment, and its extensive post-release care program, as the best indicators that the InnerChange program could reduce recidivism . . . ." In this case, the government did not act with the purpose of advancing or inhibiting religion.

To analyze whether aid has the effect of advancing or endorsing religion, three criteria are decisive: whether government aid (1) results in governmental indoctrination; (2) defines recipients by reference to religion; or (3) creates excessive entanglement. *Id.* at 234-35.[4]

First, "government inculcation of religious beliefs has the impermissible effect of advancing religion." *Agostini*, 521 U.S. at 223. Whether funding "results in

---

[4]The district court correctly stated this test. 432 F. Supp. 2d at 914-15. It then, however, focused on a "pervasively sectarian" analysis in order to determine whether government aid had the effect of advancing religion. *Id.* at 917-25. This court will apply the clear framework in *Agostini*.

governmental indoctrination is ultimately a question whether any religious indoctrination that occurs . . . could reasonably be attributed to governmental action." ***Mitchell v. Helms***, 530 U.S. 793, 809 (2000) (plurality opinion), *citing **Agostini***, 521 U.S. at 226, 230. Further, "plaintiffs must prove that the aid in question actually is, or has been, used for religious purposes." ***Id.*** at 857 (O'Connor, J., concurring in judgment). This court does not "presume inculcation of religion; rather, plaintiffs raising an Establishment Clause challenge must present evidence that the government aid in question has resulted in religious indoctrination." ***Id.*** at 858; *see **Agostini***, 521 U.S. at 223-24, 226-27 (in the absence of evidence showing use of aid to inculcate religion, there is a presumption of compliance with secular restrictions).

In the present case, plaintiffs demonstrated (and defendants do not seriously contest) that the InnerChange program resulted in inmate enrollment in a program dominated by Bible study, Christian classes, religious revivals, and church services. The DOC also provided less tangible aid to the InnerChange program. Participants were housed in living quarters that had, in previous years, been used as an "honor unit," and which afforded residents greater privacy than the typical cell. Among other benefits, participants were allowed more visits from family members and had greater access to computers.

The DOC officials stress their belief that Iowa received far more in non-religious programs than it paid for. But plaintiffs meet their burden by citing the DOC's statement:

> The DOC's "monitoring" of the InnerChange Program is limited to receiving and reviewing periodic service invoices from IFI [InnerChange]. The DOC does not, to be sure, involve itself in monitoring the InnerChange Program, IFI's billing procedures, or IFI's use of the money received from the DOC.

The presumption of compliance with secular restrictions does not apply in this case. For contract years 2000 to 2004, religious indoctrination can reasonably be attributed to Iowa's funding.

Second, in administering aid, a government may not define recipients by reference to religion. The aid must be "'allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis'" *Id.* at 813, *quoting Agostini*, 521 U.S. at 231; *id.* at 845 (O'Connor, J., concurring in judgment).

In this case, to use the aid appropriated, inmates must have been "willing to productively participate in a program that is Christian-based." The district court found that inmates' religious beliefs (or lack thereof) precluded their participation. For contract years 2000 to 2004, the InnerChange program was not allocated on neutral criteria and was not available on a nondiscriminatory basis.

Third, as for excessive entanglement, there was no pervasive monitoring by the DOC, though there was some administrative cooperation. *See Agostini*, 521 U.S. at 233-34. For the contract years 2000 to 2004, there was not excessive entanglement between Prison Fellowship, InnerChange, and the DOC.

Because the indoctrination and definition criteria indicate that InnerChange had the effect of advancing or endorsing religion during the contract years 2000 to 2004, the direct aid to InnerChange violated the Establishment clauses of the United States and Iowa Constitutions.

2.

-22-

In the 2005, 2006, and 2007 contract years, funding from the DOC to InnerChange changed *from* cost reimbursement *to* per diem payment – an attempt to make InnerChange an indirect aid program. In order to comply with the Establishment Clause, indirect aid programs must be "neutral with respect to religion," and provide "assistance directly to a broad class of citizens who, in turn, direct government aid to religious" organizations "wholly as a result of their own genuine and independent private choice." *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002). "The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." *Id.* *See also Mueller v. Allen*, 463 U.S. 388, 399 (1983).

In this case, there was no genuine and independent private choice. The inmate could direct the aid only to InnerChange. The legislative appropriation could not be directed to a secular program, or to general prison programs. *See Mitchell*, 530 U.S. at 816 (government support for religion is permissible where aid passes through the hands (literally or figuratively) of private citizens who are free to direct the aid elsewhere). For the inmate to have a genuine choice, funding must be "available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited" and the inmates must "have full opportunity to expend . . . aid on wholly secular" programs. *Witters v. Wash. Dept. of Servs. for the Blind*, 474 U.S. 481, 488 (1986) (internal citations and quotation marks omitted). *See also Agostini*, 521 U.S. at 226-28 (no violation where the aid was provided to students at whatever school they chose to attend); *Freedom from Religion Found., Inc. v. McCallum*, 324 F.3d 880, 881-82 (7th Cir. 2003) (no Establishment Clause violation where parole violator could choose to enroll in "one of several halfway houses," only one of which had a significant Christian element).

Prison Fellowship and InnerChange emphasize that from their viewpoint, they received funds only if the inmate chose them. *Zelman* makes clear that the relevant

viewpoint is the chooser's (there, the parents'), not the provider's (there, the private schools'). *See* **Zelman**, 536 U.S. at 655-56. Here, the inmate had no genuine and independent private choice because he had only one option. *See id*. at 652-53, 655, *approving* **Mitchell**, 530 U.S. at 842-43 (O'Connor, J., concurring in judgment) (a reasonable observer would perceive per-recipient direct aid to religious organizations differently than aid that recipients choose to use at religious or secular organizations).

The district court did not err in concluding that the per diem structure, as administered, violated the Establishment clauses of the United States and Iowa Constitutions.

E.

Prison Fellowship, InnerChange, and the DOC contend that any constitutional violation is subject to the standard in *Turner v. Safley*, 482 U.S. 78, 89 (1987): "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The DOC stresses that the InnerChange program is reasonably related to legitimate penological interests, and that "*Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights," quoting *Washington v. Harper*, 494 U.S. 210, 224 (1990).

Generally, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." **Pell v. Procunier**, 417 U.S. 817, 822 (1974). The *Turner* standard applies "*only* to rights that are 'inconsistent with proper incarceration,'" and "that need necessarily be compromised for the sake of proper prison administration." **Johnson v. California**, 543 U.S. 499, 510 (2005), *quoting* **Overton v. Bazzetta**, 539 U.S. 126, 131 (2003) (emphasis in original).

This court has consistently analyzed Establishment claims without mentioning the *Turner* standard, even when applying that standard to Free Exercise claims in the same case. *See Munson v. Norris*, 435 F.3d 877, 880-81 (8th Cir. 2006) (per curiam); *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 982-85 (8th Cir. 2004). In this case, there is no Free Exercise or accommodation claim, and taxpayers also assert the Establishment claims. The *Turner* standard thus cannot be used to validate funding violations of the Establishment Clause by the laws authorizing the InnerChange program at the Newton prison.

F.

The district court ordered Prison Fellowship and InnerChange to repay the state funds received under all the contracts (but stayed this equitable relief pending appeal). "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion) (*Lemon II*). The district court's equitable relief "must be measured against the totality of circumstances and in light of the general principle that, absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful." *Id.* at 208-09.

In ordering recoupment, the district court gave no weight to the fact that specific statutes, presumptively valid, authorized the InnerChange funding. The district court made no finding of bad faith by the Iowa legislature and governor (although the court criticizes the bid process and "state officials, in all branches of state government" for permitting the InnerChange program). However, the actual finding of fact regarding the Iowa state officials is:

> [T]hough evidence shows InnerChange received a warm welcome at the
> Dept. of Corrections Board, state Legislature, and Governor's Office, no

> evidence shows that the promotion of religion was the primary concern
> of those state officials in passing legislation authorizing funding.

432 F. Supp. 2d at 917. Further indicating good faith is that the legislature stopped the funding after the district court enjoined it. *See New York v. Cathedral Acad.*, 434 U.S. 125, 130 (1977) (reimbursement for pre-injunction expenses disallowed where "[t]he state legislature . . . took action inconsistent with the court's order"). The district court believed that Prison Fellowship, InnerChange, and the DOC had clear notice the program was plainly unlawful. The case the district court cites is distinguishable factually. *See Williams v. Lara*, 52 S.W.3d 171 (Tex. 2000) (a religious county-jail program held unconstitutional due to the direct participation of the sheriff in setting the program's curriculum according to his own personal religious beliefs). The district court also cites a legal memorandum by the California DOC, which has no more weight than that of any other attorney. Even if there were some risk associated with the program, it cannot be said that resolution of this case was clearly foreshadowed. *See Lemon II*, 411 U.S. at 206.

In ordering recoupment, the district court did not consider the testimony of the state prison officials – credited elsewhere in the order – that the program was beneficial and the state received much more value than it paid for. In the prison context, courts defer to the judgment of prison administrators. *See, e.g., Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (applied statute by giving "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources'"); *Washington v. Harper*, 494 U.S. 210, 223-24 (1990) ("prison authorities are best equipped to make difficult decisions regarding prison administration"); *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004), *quoting Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004) ("We accord great deference to the judgment and expertise of prison officials, 'particularly with respect to decisions that implicate institutional security'"); *Iron Eyes v. Henry*, 907 F.2d 810, 812 (8th Cir. 1990), *quoting Pitts v. Thornburgh*, 866 F.2d 1450, 1453

(D.C. Cir. 1989) ("'issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and . . . accordingly, courts should be loath to substitute their judgment for that of prison officials and administrators'"). This deference does not insulate prison administrators' decisions from judicial review. However, in shaping equitable relief, a court should consider the views of prison administrators, which oppose recoupment in this case.

The district court additionally cited Prison Fellowship's ability to repay the contract funds. Standing alone, this is not sufficient as it depends solely on the defendant's wealth and deters financially sound organizations from contracting with the government. *See Lemon II*, 411 U.S. at 207 ("Appellants would have state officials stay their hands until newly enacted state programs are 'ratified' by the federal courts, or risk draconian, retrospective decrees should the legislation fall").

Critically, the plaintiffs did not seek interim injunctive relief to prevent payment by the DOC during litigation, strengthening Prison Fellowship and InnerChange's reliance on those payments. *See id.* at 204 (reliance interest was reinforced because the "tactical choice not to press for interim injunctive suspension of payments or contracts during the pendency of the *Lemon I* litigation may well have encouraged the appellee schools to incur detriments in reliance upon reimbursement by the State"). In the absence of interim injunctive relief, expenses continued to be incurred, and payments spent, for the 24-hour care of inmates. *See Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 767 n.23 (reliance was stronger where the money had "been paid out to, and spent by, the colleges").

By the same logic, once the district court declared the funded InnerChange program unconstitutional on June 2, 2006, the defendants cannot rely on the legality of the program and cannot retain any funds for services rendered *after* the district court's order. *See id.*; *Lemon II*, 411 U.S. at 194.

Given the totality of the circumstances, the district court abused its discretion in granting recoupment for services rendered before its order.

## G.

Prison Fellowship, InnerChange, and the DOC object that the injunction is overbroad, claiming it bars InnerChange from ever contracting with the DOC. They cite the district court's ultimate statement: "[T]he InnerChange treatment program is hereby permanently enjoined from further operation at the Newton Facility, or any other institution within the Iowa Dept. of Corrections, so long as it is supported by government funding."

To the contrary, the injunction, in context, applies only to programs like those operating before the district court's order and funded by the unconstitutional structures for those years. The court's ultimate declaratory relief is:

> [T]he contractual relationship between the state of Iowa, *as managed and directed* by the named state Defendants, and InnerChange and Prison Fellowship violates the Plaintiffs' Establishment clause rights as contained in the Federal and Iowa Constitutions by *impermissibly funding* the InnerChange treatment program at the Newton Facility.

(emphasis added). The district court did not forever ban Prison Fellowship and InnerChange from operating in Iowa.

## III.

The judgment of the district court is affirmed in part, reversed in part, and the case remanded.

_____

-28-