# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3874

_____

Michael Dunham Murphy,             *
                                       *

           Appellant,           *

                                       *   Appeal from the United States
    v.                          *   District Court for the
                                       *   Western District of Missouri.

Missouri Department of Corrections;  *
Winfrey Dickerson; Dora B. Schriro;  *
Elijah Nagbe; Steve Long; Michael    *
Kemna,                             *

                                       *

           Appellees.         *

_____

Submitted: January 12, 2004
Filed: June 22, 2004

_____

Before WOLLMAN, FAGG, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Michael Murphy appeals from the district court's adverse grant of summary judgment in favor of appellees on his claims brought under 42 U.S.C. § 1983 and under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc. We affirm in part and reverse in part.

# I.

Murphy is incarcerated at the Crossroads Correctional Center in Cameron, Missouri. He is a practicing member of the Christian Separatist Church Society (CSC), a religious group that holds as a central tenet the belief that its members must all be Caucasian because they are uniquely blessed by God and must separate themselves from all non-Caucasian persons. Murphy seeks formal recognition and group worship accommodation for CSC within the Missouri Department of Corrections (MDOC) and contends that MDOC has discriminated against him because of his religious beliefs.

Murphy pursued recognition and accommodation for CSC by following MDOC procedure and filling out a "Request for Accommodation of Religious Practices" in July 2000. MDOC granted members of CSC solitary practitioner accommodation, but denied group worship as an accommodation. MDOC contends that its decision was necessary to preserve security and to reduce the likelihood of racial violence, which, according to prison officials, can be easily fueled by racial separation and inflammatory rhetoric. Solitary practitioner accommodation entitles a prisoner to practice his religion privately in his cell, to keep a sacred religious text, to receive other literature, subject to correctional center procedures and censorship guidelines, to have access to clergy visits, to adjust activities in order to observe holy days, and to wear a religious symbol, subject to certain guidelines. In support of its decision to limit CSC to solitary practitioner status, MDOC emphasizes the need for flexibility when it comes to prison security concerns and notes that it acted in a manner consistent with MDOC's policy of not allowing exclusion from religious services based on race. Policy IS17-1.1 § III.G.1.

Murphy filed a pro se complaint requesting injunctive and monetary relief. He claims that he was improperly denied privileges that have been given to other separatist groups, including communal worship, religious funding and institutional

TV air time for religious videos. He also argues that a certain piece of mail, Issue 36 of a religious publication called The Way, was improperly censored.

## II.

We review de novo a grant of summary judgment. Evergreen Invs., LLC v. FCL Graphics, Inc., 334 F.3d 750, 753 (8th Cir. 2003). Summary judgment is proper if, after viewing the evidence and construing it in a light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(a). If the moving party has presented evidence establishing that there is no genuine issue of material fact, the burden shifts to the non-moving party to provide evidence demonstrating that a genuine issue of material fact does in fact exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). We consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consisted of hearsay, or purported to state legal conclusions as fact. See Shaver v. Independent Stave Co., 350 F.3d 716, 723 (8th Cir. 2003); Fed. R. Civ. P. 56(e).

Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting. Turner v. Safley, 482 U.S. 78, 81 (1987). A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. Id. at 89-90. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Id. at 90. Third, we examine whether an

accommodation would have "a significant 'ripple effect'" on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." Id. at 90-91.

Murphy raises four constitutional claims in his section 1983 action: A free exercise of religion claim, an establishment clause claim, an equal protection claim, and a free speech claim. He raises an independent statutory claim under RLUIPA, 42 U.S.C. § 2000cc-1, which is subject to review under a different standard.

## A.

Murphy contends that MDOC violated his First Amendment free-exercise right when it refused to grant CSC the accommodation of group worship rights.[1] In analyzing this claim, we consider first the threshold issue of whether the challenged governmental action "infringes upon a sincerely held religious belief," Hamilton v. Schriro, 74 F.3d 1545, 1550 (8th Cir. 1996), and then apply the Turner factors to determine if the regulation restricting the religious practice is "reasonably related to legitimate penological objectives." O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987). We accord great deference to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security." Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004).

Whether or not group worship is a sincerely held religious belief is a factual determination, so we must not quickly dismiss such claims on summary judgment by concluding that those beliefs are not genuine. See Ochs v. Thalacker, 90 F.3d 293,

---

[1]Because this free exercise claim is raised directly under the First Amendment, we apply the Turner factors to analyze the reasonableness of the restriction. See Hamilton, 74 F.3d at 1550-51. Murphy's separate statutory free exercise claim is discussed below. See Infra, Part II.E.

296 (8th Cir. 1996). For purposes of summary judgment, then, we assume that Murphy's belief that group worship is necessary to his faith is genuine.

Applying the first factor of the Turner reasonableness test, we find that the decision not to grant CSC group worship rights was rationally connected to MDOC's legitimate interest in safety and security. MDOC stated that its decision about CSC was based on security concerns because racial segregation will spark violence. Institutional security is "the most compelling government interest in a prison setting," Goff, 362 F.3d at 549 (citing Ochs, 90 F.3d at 296), and security is particularly important in dealing with group activities because of the potential for riots and the extensive damage resulting therefrom.

Applying the second Turner factor, we conclude that there are sufficient alternative means for a member of the CSC faith to practice his faith without group worship. A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so. See Hammons v. Saffle, 348 F.3d 1250, 1256 (10th Cir. 2003). In O'Lone, the Supreme Court concluded that Muslim prisoners had alternative means of exercising their religion, even though a regulation made it impossible to practice a particular Muslim ritual. O'Lone, 482 U.S. at 352. Here, although he cannot participate in group worship, as a solitary practitioner Murphy can still study the scriptures and CSC materials, pray, occasionally meet with CSC clergy, observe holy days, and worship in other ways. He can also communicate with individual fellow CSC members through permitted inmate interactions, though not in a formalized group study.

The other two Turner factors also support the conclusion that MDOC's restriction on group worship was reasonable. A decision by MDOC to accommodate CSC and grant group worship rights would place increased demands on correctional staff and could lead to even greater division and violence among all the prisoners. In addition, there are no obvious, easy alternatives to solitary practitioner status that

would further both CSC members' interest in group worship and MDOC's interest in preventing escalated security concerns and costs. Accordingly, in light of the deferential standard of review established by Turner, we conclude that the district court did not err in granting summary judgment to appellees on Murphy's free exercise claim.

**B.**

Murphy argues that MDOC has violated his equal protection rights as a CSC member because it has not applied in an equal manner its policy of refusing segregated groups group worship privileges. He argues that MDOC discriminatorily treated CSC member requests differently from the requests of other separatist religious groups that have been recognized and accommodated with group worship time. Appellees respond that they have treated Murphy and CSC members differently because CSC is not in fact similarly situated to other racially polarized groups for whom separatism is not central to their faith. The different treatment is therefore based on security concerns, not discrimination, they say.

The Fourteenth Amendment requires that the government "treat similarly situated people alike," a protection that applies to prison inmates. Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)). To succeed on an equal protection claim, Murphy must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest. Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc) (analyzing equal protection in the context of asserted qualified immunity).

We ask first whether Murphy is in fact similarly situated to the other groups of individuals he claims were accommodated. Rouse, 193 F.3d at 942. To survive summary judgment, he must identify the characteristics of the class he claims to be

similarly situated to and present some evidence that other groups within the class were not also restricted in similar ways.  See Id. at 942-43.  If there is no evidence to support the claim that valid prison restrictions were applied unequally, then summary judgment is appropriate.  Id. at 943.

The parties disagree over whether there are any religious groups similarly situated to CSC.  Murphy alleges that two other religious groups in the prison, the Nation of Islam and the Moorish Science Temple of America, are similarly situated to CSC because they are also segregated in practice.  Murphy provided numerous affidavits from his fellow Separatist believers stating that the Moorish Science Temple of America and the Nation of Islam do not allow Caucasians at their services. Murphy provided no evidence, however, that separatism is a central religious tenet of either the Nation of Islam or the Moorish Science Temple of America.

MDOC's supervisor of religious/spiritual programming, Winfrey Dickerson, testified that no other religion given group worship privileges at MDOC "espouse[s] racial separatism as a tenant [*sic*] of their religion or maintain[s] that worship services must be limited to one particular race."  Appellees also maintain that because CSC's espousal of racial separatism as a central and mandatory tenet is more likely to incite violence, a legitimate penological reason exists for treating CSC differently. Accordingly, they argue that their regulations, some of which reflect their focus on major religious tenets,[2] were not applied discriminatorily.

---

[2]MDOC policy IS17-1.1 § III.G.7.c. provides that it will accommodate a prisoner's request regarding religious practices when:
> (1) the request clearly reflects a sincerely held belief in regard to the major religious tenets, and
> (2) the request is based on clearly established major religious tenets, and
> (3) the request does not compromise the safety and security of the institution.

We conclude that no material issue of fact exists as to whether the groups are similarly situated. Once again, giving due deference to the expertise of prison officials, we conclude that the distinction MDOC has proffered is legitimately related to its penological interests. Racial separatism may certainly be more inflammatory and a greater security concern when it is mandated by the dogma of a particular religion than when it is a factual result of a particular ideology. Summary judgment was therefore appropriately entered in favor of appellees on this claim.

### C.

Murphy also raises an establishment clause claim, arguing that MDOC favored other religions by allowing them to present programs on the religious channel of the prison television network and refusing to show CSC programs.[3] We apply the test set forth in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612 (1971), which provides that the government action does not violate the Establishment Clause if it has a secular purpose, does not have a primary effect of advancing or inhibiting religion, and does not result in excessive entanglement with religion. <u>Id.</u> at 612-13.

MDOC's purpose in providing the religious channel was to create a forum in which a large range of religious messages could air, subject only to MDOC's economic and security concerns, policed by its censorship committee. The programming on the religious channel promotes freedom of religion and a broad spectrum of religious ideas within the prison. MDOC occasionally shows videos about the Nation of Islam and the Moorish Science Temple, but there is no evidence that MDOC exclusively promotes or favors any one particular religion in its programming. The primary effect of MDOC's religious programming choices, then, is not to inhibit Murphy's religion but to promote religious exercise within the limits

---

[3]As evidence, Murphy provided the affidavit of his roommate, who testified that the religious channel frequently shows Nation of Islam and Moorish Science Temple programs.

of institutional security needs.  Accordingly, the district court did not err in granting summary judgment to appellees on this claim.

**D.**

Murphy argues that appellees violated his First Amendment right to free speech when they refused to deliver a publication he had received in the mail based on MDOC's censorship policy, a claim that is also subject to analysis under Turner.

Regulations involving the review of incoming mail in prisons need only be "reasonably related to legitimate penological interests."  Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989) (citing Turner, 482 U.S. at 89).  A regulation that allows for censorship of incoming items that are likely to incite violence is related to the institutional needs of maintaining a controlled and secure environment among the prison population.  See Ortiz v. Fort Dodge Corr. Facility, No. 03-1868, 2004 WL 1151931, at *2 (8th Cir. May 25, 2004).  A regulation valid and neutral in other respects may be invalid if it is applied to the particular items in such a way that negates the legitimate concerns.  See Thornburgh, 490 U.S. at 419.  We therefore ask "whether a ban on these particular items is reasonably related to a legitimate penological objective."  Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997). We have previously held that a total ban on publications that espouse white supremacy is overly broad and does not closely conform to the purpose of upholding the security of the prison.  Murphy v. Missouri Dep't of Corr., 814 F.2d 1252, 1256 (8th Cir. 1987).  Before the prison authorities censor materials, they must review the content of each particular item received.  Williams, 116 F.3d at 354.  We conduct an "independent review of the evidence" to determine if there has been "an exaggerated response to prison concerns" in relation to this particular item.  Williams, 116 F.3d at 354 (citation omitted).

MDOC has an established procedure for reviewing inmate mail.  Questionable items received in the mail are reviewed by a three-person censorship committee and

then, if necessary, by a litigation coordinator. MDOC followed its procedure in reviewing Issue 36 of The Way, but documented its conclusion only with the statement that the issue was "so racially inflammatory as to be reasonably likely to cause violence." Although MDOC's procedure is reasonably related to legitimate penological interests, we conclude, based on our independent review of the evidence, that a material issue of fact remains as to whether MDOC's choice to censor Issue 36 satisfies the Turner factors. As we read it, Issue 36 does not appear to counsel violence, and MDOC's documented reason for censoring the item is too conclusory to support a judgment in its favor on this issue. We recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment, but summary judgment would be appropriate only if MDOC presented some specific evidence of why this particular item implicates prison concerns.

Accordingly, we reverse and remand on this issue. In doing so, we note that if MDOC has additional evidence to support its decision to withhold Issue 36 of The Way, it may again move for summary judgment, for an initial denial of summary judgment does not establish "the law of the case" such that the ruling may not be revisited. Curran v. Kwon, 153 F.3d 481, 487 (7th Cir. 1998); see also Breeland v. Southern Pac. Co., 231 F.2d 576, 579 (9th Cir. 1955).

**E.**

In addition to his constitutional claims, Murphy has raised a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq. By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims. The statute provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 2 of the Civil Rights of Institutionalized Persons Act (42

U.S.C. § 1997), even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).[4]

RLUIPA was enacted in 2000 and contains language similar to that contained in the Religious Freedom Restoration Act of 1993 (RFRA), the predecessor statute that the Supreme Court held to be unconstitutional as applied to states and localities in City of Boerne v. Flores, 521 U.S. 507 (1997) (holding that Congress had exceeded its authority by using its section five power under the Fourteenth Amendment to enact the statute). In RLUIPA, Congress resurrected RFRA's language, but narrowed the scope of the act, limiting it to laws and regulations concerning institutionalized persons or land use. See 42 U.S.C. §§ 2000cc & 2000cc-1.

We applied RFRA's strict scrutiny test in several prisoner free exercise cases, and we now look to those cases for guidance. See Weir v. Nix, 114 F.3d 817 (8th Cir. 1997); Ochs, 90 F.3d 293; Hamilton, 74 F.3d 1545. Although we required the government to meet a higher burden than the rational relation test applicable in constitutional claim cases, we nevertheless accorded a significant degree of deference to the expertise of prison officials in evaluating whether they met that burden. Hamilton, 74 F.3d at 1554; Weir, 114 F.3d at 820 n.6; Ochs, 90 F.3d at 296. That

---

[4]We are not called upon to address the constitutionality of this section, so we consider only the application of its language. Of those courts that have considered its constitutionality, several have found it constitutional. See Madison v. Riter, 355 F.3d 310 (4th Cir. 2003); Charles v. Verhagen, 348 F.3d 601 (7th Cir. 2003); Mayweathers v. Newland, 314 F.3d 1062 (9th Cir. 2003). But see Cutter v. Wilkinson, 349 F.3d 257 (6th Cir. 2003).

deference was grounded on the fact that RFRA's test should be adjusted for the different contexts in which free exercise claims arise, the prison context being one with special needs. Hamilton, 74 F.3d at 1554. We noted that RFRA's legislative history established that Congress intended such contextualization. Id., at 1553-54.

Because RLUIPA's scope is narrower, with language that applies solely to the prison context, the question remains whether the statute requires us to accord the same deference to the expertise of prison officials as that which we accorded in cases arising under RFRA. Congress used the same strict scrutiny language from RFRA in the RLUIPA section that applies only to prisoners, 42 U.S.C. § 2000cc-1(a), but did not specifically codify the contextualized treatment that many courts had given the test in the prison context.

Although the legislative history is brief, several factors cause us to conclude that Congress intended that the language of the act is to be applied just as it was under RFRA. Congress did not intend to overly burden prison operations, but rather intended to provide as much protection as possible to prisoners' religious rights without undermining the security, discipline, and order of those institutions. See 146 Cong. Rec. S6687 (July 13, 2000) (statement of Sen. Hatch, introducing the bill). The bill was presented as an attempt to re-institute some of the protections of RFRA after it had been found unconstitutional by the Supreme Court. A joint statement of Senator Orrin Hatch and Senator Edward Kennedy, co-sponsors of the bill, stated:

> The compelling interest test is a standard that responds to facts and context. What the Judiciary Committee said about that standard in its report on RFRA is equally applicable to This Act:
>
> > [T]he committee expects that courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good

-12-

order, security and discipline, consistent with consideration of costs and limited resources.

At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

Senate Report 103-111 at 10 (1993).

146 Cong. Rec. S7775 (July 27, 2000). Both houses quickly passed identical bills with no amendments. See Bill Summary and Status Report, 106th Congress, S.2869 and H.R.4862, available at http://thomas.loc.gov. In light of this legislative background, then, we conclude that the standard applied under RFRA should likewise be applied to cases arising under RLUIPA.

RLUIPA requires that Murphy show, as a threshold matter, that there is a substantial burden on his ability to exercise his religion. 42 U.S.C. § 2000cc-2(b). To constitute a substantial burden, the government policy or actions:

must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'

Weir, 114 F.3d at 820 (alteration in original) (citation omitted). As we indicated in our analysis of Murphy's constitutional free exercise claim, we hesitate to make judgments about whether a religious belief is sincere or not. See Ochs, 90 F.3d at 296. Thus, we conclude that the district court improperly concluded on summary judgment that Murphy's religion was not substantially burdened and that "group

-13-

worship and group discussion and study, cannot be said to be tenets or beliefs central to his religion." D. Ct. Opinion of Sept. 27, 2002, at 7. We have stated that a substantial burden to free exercise rights may exist "when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." Weir, 114 F.3d at 821. Murphy has asserted numerous beliefs and aspects of his faith that are incompatible with Protestant Christian beliefs. He has also asserted that communal worship is an important part of his religion. Whether Murphy can establish the truth of these allegations and the existence of a substantial burden on the exercise of his religion is a matter to be determined by the district court in the first instance following a trial on the merits on this issue.

Assuming that Murphy's religious practice has been substantially burdened, MDOC can still prevail if it establishes that its choice to give Murphy only solitary practitioner status was the least restrictive means to further a compelling interest. We conclude that although its actions were justified under the Turner reasonableness analysis, there is insufficient evidence to conclude that appellees have satisfied the heavier burden imposed upon them under RLUIPA.

We acknowledge that MDOC has a compelling interest in institutional security. Ochs, 90 F.3d at 296. Nevertheless, it must do more than merely assert a security concern. Although we give prison officials "wide latitude within which to make appropriate limitations," they "must do more than offer conclusory statements and post hoc rationalizations for their conduct." Hamilton, 74 F.3d at 1554 (citation omitted). The threat of racial violence is of course a valid security concern, but to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence will result from any accommodation of CSC's request. See Ochs, 90 F.3d at 296-97 (indicating that the court considered the prior racial violence a relevant part of its decision to defer to prison authorities' security concerns).

-14-

We do not require evidence that racial violence has in fact occurred in the form of a riot, but we do require some evidence that MDOC's decision was the least restrictive means necessary to preserve its security interest. 42 U.S.C. § 2000cc-1(a)(2). There exists a question of fact as to whether there are means available to MDOC less restrictive than the total preclusion of group worship for CSC members. It is not clear that MDOC seriously considered any other alternatives, nor were any explored before the district court. The only evidence MDOC submitted to support its claim of security concern was testimony suggesting that Murphy is a racist and that his religion requires that only Anglo-Saxon individuals may participate. We cannot conclude from this limited evidence that MDOC has met its burden of establishing that its limitation on Murphy's religious practices constituted the least restrictive means necessary to ensure the prevention of racial violence within the prison. Accordingly, we remand for further fact finding on this issue.

The judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings consistent with the views expressed in this opinion.

_____