# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3528

_____

| | | |
|---|---|---|
| Lawrence Gladson; Darrell Smith; Scott Howrey, | * * * | |
| Appellants, | * * | |
| v. | * * * | Appeal from the United States District Court for the Southern District of Iowa. |
| Iowa Department of Corrections; Gary Maynard; Kay Kopatich; Ken Burger; John Emmett; Jay Nelson; William Sperfslage; Del Vande Krol; Michael Gilbert; Debbie Farrell, | * * * * * * | |
| Appellees. | * | |

_____

Submitted: September 25, 2008
Filed: January 8, 2009

_____

Before WOLLMAN, SMITH, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Lawrence T. Gladson, Darrell Smith, and Scott Everett Howrey, inmates at the Iowa State Penitentiary (ISP) in Fort Madison, Iowa, and practitioners of the Wiccan religion, brought this lawsuit against Assistant Warden William Sperfslage of the ISP. The inmates sought injunctive relief and monetary damages, claiming that the ISP violated their rights under the Free Exercise Clause of the First Amendment of the United States Constitution and the Religious Land Use and Institutionalized Persons

Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1 et seq. They contend that the ISP unconstitutionally limited their observance of Samhain—the most important of the eight Wiccan holidays—to three hours and that the ISP treatment director limited the quantity of food available for the Samhain holiday. The magistrate judge[1] denied injunctive relief,[2] concluding that the challenged restrictions did not impose a "substantial burden" on the exercise of the inmates' sincerely-held Wiccan beliefs. The inmates appeal. For the reasons discussed below, we affirm.

## I. *Background*

Gladson, Smith, and Howrey, inmates in the custody of the Iowa Department of Corrections (IDOC) and housed at the ISP (collectively "inmates"), are practitioners of Wicca, a religion that the IDOC now recognizes as a result of *Hood v. Kautsky*, 4:00-cv-10602 (S.D. Iowa Nov. 21, 2002). In *Hood*, the ISP officials and Wiccan inmates settled a dispute over whether the ISP would recognize Wicca as a religion. The written settlement agreement acknowledged that the "Wiccan religion is recognized at the [ISP] and treated like other religious groups at ISP." The settlement agreement also "document[ed] the current conditions at ISP," noting that eight Wiccan religious holidays were recognized, four of which the inmates were to celebrate during the weekly religious services, with a "special service" allowed for the other four. One

---

[1] The Honorable Ross A. Walters, United States Magistrate Judge for the Southern District of Iowa, sitting by consent of the parties in accordance with 28 U.S.C. § 636(c).

[2] By a Report and Recommendation entered November 21, 2006, the magistrate judge recommended that the district court grant summary judgment to the ISP defendants on qualified immunity grounds as to all claims for compensatory and punitive damages but otherwise deny summary judgment. The Honorable James E. Gritzner adopted the Report and Recommendation. Additionally, in the parties' Joint Pretrial Statement, they stipulated that all of the defendants except Warden Sperfslage were dismissed.

of the "special services" was the Samhain holiday. The ISP was to permit the Wiccan inmates to purchase holiday foods for Samhain and other special services.

Gladson submitted a prison grievance on behalf of the Wiccan inmates, complaining that the ISP had only afforded them three hours to celebrate Samhain instead of eight hours. Gladson believed that the settlement agreement allowed Wiccan inmates a "Feast Day" of eight hours for Samhain. Gladson also requested that the time be made up at the next special holiday service. The ISP denied the grievance because religious grievances were considered "non-grievable"; thereafter, Gladson, as instructed, wrote, on two separate occasions, to IDOC's religious coordinator, Chaplain Kay Kopatich, with the same complaint and request. Kopatich denied both of Gladson's requests—one in 2003 and one in 2006—after investigating Gladson's grievances. In 2003, Chaplain Kopatich consulted with two Wiccan priestesses, one located in California and the other located in Des Moines, and inquired about the practice at other IDOC institutions. She testified that she attended a Samhain celebration at a community center in Des Moines and witnessed the entire event around October 2004. According to Chaplain Kopatich, the celebration lasted about three hours, perhaps a little longer. At the celebration, a priestess cleansed the area, cast a circle, and performed a ritual to honor ancestors. The participants danced, drummed, sang, and referenced the four directions. The ritual lasted just under two hours and refreshments were served afterwards.

After their grievances were denied, Gladson, Smith, and Howrey filed suit against numerous state prison officials for damages and injunctive relief for alleged restrictions on the practice of their Wiccan beliefs. The inmates subsequently dismissed all of their claims except those pertaining to (1) the length of time allowed for the celebration of the Wiccan Samhain holiday and (2) food for an associated feast. The complaint alleged that the ISP limited their observance of Samhain in violation of their rights under the Free Exercise Clause and RLUIPA.

The magistrate judge, sitting by consent of the parties, concluded that the inmates were sincere in their Wiccan beliefs, and neither party disputes this factual finding on appeal. In addition, the magistrate found that the *Hood* settlement agreement was silent regarding a "Feast Day" or any particular length of time for the Samhain observances. The agreement only stated that a special service would be allowed on Samhain. The magistrate judge found that, viewed in context, "the settlement agreement supports an inference [that] three hours is what the parties had in mind." The magistrate judge noted that prison records in evidence indicated that the first approved Samhain observance was on October 31, 2001, for three hours in the chapel. In 2002, 2003, and 2004, the ISP also set three hours of chapel time aside for the Wiccans to observe Samhain.

Based on these facts, the magistrate judge concluded that the settlement agreement implicitly approved three hours as sufficient to celebrate Samhain because that was the standard time then observed. The magistrate judge determined that his conclusion was bolstered by a letter that Michael Hood, a prior High Priest of the ISP coven and ISP Wiccan Class Plaintiff Representative in *Hood*, wrote to the Honorable Ronald E. Longstaff, the judge to whom the case was assigned, that the ISP had met its obligations under the settlement agreement and that "the Wicca class plaintiffs at the I.S.P. are satisfied . . . ." Neither party disputes the magistrate judge's factual findings regarding the settlement agreement.

The magistrate judge then made factual findings about the Samhain holiday. Samhain is derived from the Celtic celebration of the new year at the end of October. It is the most important of the eight annual Wiccan holidays and serves several purposes. It commemorates harvest time and occurs at a time of the year—Halloween—when Wiccans believe that the separation between this world and the spirit world is most conducive to communication with the dead and to forecast the upcoming year. Wiccans celebrate the holiday with a ritual followed by a feast called the "Dumb Supper." According to the *Witches' Bible*, "Samhain was on the one hand

-4-

a time of propitiation, divination and communication with the dead, and on the other, an uninhibited feast of eating, drinking and a defiant affirmation of life and fertility in the very face of the closing dark."

The Samhain celebration at the ISP contains four parts: set-up, ritual, feast, and clean-up. The set-up involves laying out a circle and constructing an altar. Among the Wiccan "communal items" that the *Hood* settlement agreement specifies to be kept in the prison chapel are a 30-inch diameter oak altar in three pieces, an altar paten (a wood pentagram), a serving plate, and an altar cloth. Taking the testimony of Hood and Gladson together, the magistrate judge concluded that the ritual consists of cleansing the area of energies from other groups, blessing the circle, cleansing or purifying the participants (a process that Gladson testified takes 10 to 15 minutes per person), passing salt, blessing water, and "calling liturgy and deities," with periods of meditation for "scrying" (the use of instruments such as a crystal ball or candle to communicate with the dead). After the inmates complete the ritual, they then have the Dumb Supper, which is a "lusty and wholehearted feast." At the feast, the inmates eat, socialize, play games, and continue scrying. The food items are supposed to be seasonal, focusing on harvest time. The inmates are required to clean-up, put away their celebratory items, and leave the chapel area by the end of the three-hour period.

According to Hood, the three-hour time limit caused the ritual to be rushed, and he had to omit some things, leaving little time for him to participate in the feast. Gladson also testified that three hours is not sufficient time to complete the full ritual and feast. The magistrate judge found Hood's and Gladson's testimony concerning the Samhain observances "for the most part conclusory." While Hood and Gladson identified various components of the ritual, the magistrate judge found that they failed to offer an adequate description from which he could infer the reasonable length of time involved. Gladson testified that the purification of each participant took up to 15 minutes, and Hood testified that each participant might take 15 to 20 minutes scrying, but the magistrate judge was "reluctant to take this testimony at face value." The judge

noted Hood's testimony about the constraints resulting from the allotted time contradicted the settlement agreement that he signed, which indicated that the ISP had adequately accommodated the Wiccan group's religious beliefs. The magistrate judge also found that setting up the small altar and altar items described in the *Hood* settlement would not take much time. Furthermore, the food for the meal arrives prepared and is ready immediately upon conclusion of the ritual. According to the magistrate judge, the banquet was not "elaborate" and clean-up of the "simple altar" and celebratory items should not take much time, especially in light of the few remaining members of the Wiccan group.[3]

With regard to the food for Samhain, the ISP originally permitted the Wiccan inmates to bring food for the feast from their cells, which they obtained from the prison commissary. Carrying food across the yard posed a problem, and the ISP changed the policy to require that the inmates order prepared food for the feast from a local food store outside of the prison. For the 2006 Samhain observance, the food order included small sausages, chicken, cheese, orange juice, ice cream, pie, bread, and grapes. The prison treatment director processes the food orders. Since the time that the ISP recognized the Wiccan group, the ISP has had three treatment directors. The Wiccan inmates experienced no problems with the first director but did experience problems with the second director, who, according to Hood and Gladson, would sometimes eliminate food items or reduce the quantity of food without explanation. The Wiccan inmates have had no trouble with the third director. As a result, the magistrate judge concluded that "[t]he likelihood the Wicca group's food orders will again be short-changed is only speculative."

Wiccan religious observances are held in the frequently-used prison chapel. It is open to inmates from 7:00 a.m. to 2:20 p.m. each day. Protestant Chaplain Delvin Vande Krol is the ISP religious coordinator and responsible for scheduling use of the

---

[3]According to Gladson, the Wiccan group is now down to four inmates.

chapel. The ISP makes the chapel available to 13 religious groups. The prison has two general population groups that have to be kept separated, GP1 and GP2. The GP1 group is populated by more aggressive, higher security risk inmates. Inmate enemies are typically placed in separate groups to avoid conflict. As a result, there are up to 26 separate groups of inmates using the chapel. Typically, each group gets two hours of chapel time a week—one for worship and one for study time. Chaplain Vande Krol occasionally includes two groups at once to accommodate everyone. He also schedules special holiday celebrations for the various groups, also typically held in the chapel. He tries to provide equal time for each group. Three hours is the standard for special holiday observances.[4] The Wiccan inmates receive three hours for Samhain and the three other "special service" holidays identified in the *Hood* settlement.

The magistrate judge denied injunctive relief to the inmates, concluding that no evidence existed in the record to support a finding that the observance of the Samhain holiday is substantially burdened if less than eight hours are afforded, as "[n]o doctrinal basis is put forward to support such a claim nor can the necessity of eight hours be inferred from the limited description in the record of activities associated with the Samhain holiday."

## II. *Discussion*

According to the inmates, the magistrate judge erroneously applied an objective "doctrinal justification" requirement in determining that the three-hour limitation did not "substantially burden" their ability to celebrate the Samhain festival and feast under RLUIPA and the Free Exercise Clause. They ask this court to hold that the three-hour time limitation constitutes a "substantial burden" and remand the case to the magistrate judge for consideration of the remaining elements of their RLUIPA claim and Free Exercise claim.

---

[4]Exceptions do exist to the three-hour holiday standard. We will not address such exceptions, as the inmates have not alleged an Equal Protection claim in the present case.

In response, Sperfslage argues that no evidence exists that the inmates' celebration of Samhain is burdened by the imposition of a three-hour time limit. Additionally, Sperfslage asserts that Howrey's claim for injunctive relief is moot and must be dismissed because Howrey is no longer incarcerated at the ISP.

## A. *RLUIPA and Free Exercise Claims*

While prisoners retain their constitutional rights, they are subject to limitations on those rights "in light of the needs of the penal system." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004), *cert. denied*, 543 U.S. 991 (2004). An inmate's constitutional claims are evaluated under a lesser standard of scrutiny, even though such claims would receive strict scrutiny analysis if brought by a member of the general population. *Id.* "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). We consider four factors in making this determination: (1) "whether there is a 'valid rational connection' between the prison regulation and the government interest in justifying it"; (2) "whether there is an alterative means available to the prison inmates to exercise the right"; (3) "whether an accommodation would have a 'significant 'ripple effect' ' on the guards, other inmates, and prison resources"; and (4) "whether there is an alternative that fully accommodates the prisoner 'at de minimis cost to valid penological interests.'" *Id.* at 982–83 (quoting *Turner*, 482 U.S. at 89–91). With regard to the second factor, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Id.* at 983.

In analyzing a Free Exercise claim, "we consider first the threshold issue of whether the challenged governmental action infringes upon a sincerely held religious belief and then apply the *Turner* factors to determine if the regulation restricting the religious practice is reasonably related to legitimate penological objectives." *Id.* (internal quotations and citations omitted). We give "great deference to the judgment

and expertise of prison officials, particularly with respect to decisions that implicate institutional security." *Id*. (internal quotations and citation omitted).

A prisoner's claim under RLUIPA is evaluated under a different standard than a First Amendment claim. "By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims." *Id*. at 987. The statute provides, in relevant part:

> No government shall impose a *substantial burden* on the religious exercise of a person residing in or confined to an institution, as defined in section 2 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. § 1997), even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a) (emphasis added). While the government must meet a higher burden than the rational relationship test applied in constitutional cases, we do afford "a significant degree of deference to the expertise of prison officials in evaluating whether they met that burden." *Murphy*, 372 F.3d at 987.

As a threshold matter, RLUIPA requires a prisoner to show "that there is a substantial burden on his ability to exercise his religion." *Id*. at 988 (citing 42 U.S.C. § 2000cc-2(b)). To constitute a "substantial burden," government policy or actions

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs;

must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Id.* (internal quotations, citations, and alterations omitted); *see also Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981) ("Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."). "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).

Although we stated in *Murphy* that the conduct or expression must manifest a "central tenet" of the person's religious beliefs, the Supreme Court has since clarified that "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). "The Act defines 'religious exercise' to include 'any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief.'" *Id.* at 715 (emphasis added) (quoting 42 U.S.C. § 2000cc-5(7)(A)). In light of *Cutter*, we have recognized that "portions of th[e] definition [stated in *Murphy*] requiring religious beliefs to be a 'central tenet' or 'fundamental' may not apply to a RLUIPA claim." *Patel*, 515 F.3d at 813 n.7. In the present case, we need not reach the issue "because the parties do not contest the sincerity of [the inmates'] religious beliefs or the significance [of celebrating the Samhain holiday] to [their] faith." *Id.*

In summary, when faced with both a Free Exercise claim and a RLUIPA claim, a court must, as a threshold matter, inquire as to whether the prison has placed a

"substantial burden" on the prisoner's ability to practice his religion. *Id.* at 813. "Once it is determined that a regulation imposes a substantial burden on a prisoner, the review of that burden under the Free Exercise Clause differs from [ ] RLUIPA." *Id.* If the prisoner fails to put forth sufficient evidence that his ability to practice his religion has been substantially burdened, then the court need not apply the *Turner* test to the Free Exercise claim and the strict scrutiny test to the RLUIPA claim. *Id.*

Here, the inmates argue that the magistrate judge erroneously applied an objective "doctrinal justification" requirement in determining that the three-hour limitation does not "substantially burden" their ability to celebrate the Samhain festival and feast. Appellant's Brief at 17–20 (citing *Thomas*, 450 U.S. at 715 ("Intrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses."); *Frazee v. Ill. Dep't of Employment Sec.*, 489 U.S. 829, 834 (1989) ("[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization. Here, Frazee's refusal was based on a sincerely held religious belief. Under our cases, he was entitled to invoke First Amendment protection.")).

We agree with the inmates that no "doctrinal justification" is required to support the religious practice allegedly infringed. The proper test to apply in determining whether government policy or actions constitute a "substantial burden" is set forth in *Murphy,* as modified by *Cutter.* Under this test, the inmate bears the burden of establishing that the correction facility has placed a substantial burden on his sincerely-held religious belief.[5]

---

[5]The sincerity of the inmates' beliefs is not at issue here because Sperfslage does not dispute the magistrate judge's finding that the inmates are sincere in their beliefs.

For example, in *Patel*, a federal prisoner sued the Bureau of Prisons (BOP) and prison officials, alleging that they violated his right to practice his Muslim religion by failing to provide him with appropriate meals in violation of, inter alia, the Free Exercise Clause and RLUIPA. 515 F.3d at 810. With respect to appropriate meals to serve Muslim inmates, "[t]he BOP consulted with various religious leaders, including Muslims, and researched the beliefs and practices of numerous faiths in extensive detail. As a result, the BOP developed a cost-effective plan designed to accommodate all of the estimated thirty-one religious groups represented in the system." *Id*. The prisoner argued that "the alternative means by which he may practice his Muslim faith through dietary accommodation offered by the BOP are inadequate." *Id*. at 833 ("He could self-select a vegetarian diet from the hot bar, but he claims that the food is cross-contaminated. He could supplement the Common Fare meals from the salad bar, but he claims that the food and serving pans are also cross-contaminated. He could consume the Common Fare meals, but he would be forced to refrain from consuming kosher meat entrées, which make up ten of the fourteen dinner meals every two weeks and which he claims do not satisfy his stricter halal requirements."). The prisoner also argued that the option of purchasing halal vegetarian entrees and substituting them for kosher meat entrees on days meat is served at dinner would be "cost prohibitive." *Id*.

We rejected the prisoner's claims, finding that the prisoner "has not offered sufficient evidence to create a genuine issue of material fact sufficient for a jury to find that his ability to practice his religion has been substantially burdened." *Id*. at 814. The prisoner had the option of purchasing halal vegetarian entrees on days that allegedly inadequate kosher meat entrees were served, he received money from work and his family members to pay for these meals, and he had not pursued alternatives, such as requesting to be first in line at the food bar to avoid cross-contamination of the vegetarian dishes. *Id*.

Here, the inmates have failed to offer any evidence that the ISP's grant of three hours for them to celebrate Samhain significantly inhibits or constrains their conduct

or expression; meaningfully curtails their ability to express adherence to their faith; or denies them reasonable opportunities to engage in those activities that are fundamental to their religion. As a result, the inmates, as in *Patel*, have not offered sufficient evidence to create a genuine issue of material fact sufficient for a jury to find that their ability to practice Wicca has been substantially burdened.

First, the inmates have not contested on appeal the magistrate judge's factual finding that the settlement agreement, by indicating the conditions under which Wicca was then being observed were satisfactory, arguably reflects an understanding that three hours of time to celebrate Samhain was adequate. As the magistrate judge noted, in 2002, 2003, and 2004, the ISP afforded Wiccan inmates three hours to celebrate Samhain. The magistrate judge's conclusion is also bolstered by Hood's letter to the district court, dated February 20, 2003, in which Hood, the ISP Wiccan Class Plaintiff Representative, stated, "Since the state has met their part of the settlement agreement in its entirety, the Wicca class plaintiffs at the I.S.P. are satisfied . . . ." No evidence exists in the record, nor have the inmates advanced any argument, explaining what changed between the execution of the settlement agreement and the filing of the present lawsuit to justify a five-hour increase in the amount of time needed to celebrate Samhain.

Second, with regard to the amount of time designated for the Samhain celebration, the inmates have not demonstrated how the magistrate judge's conclusion that the inmates' testimony was "for the most part conclusory" was clearly erroneous. Like the magistrate judge, we could find no adequate description in the record from which we could infer the reasonable length of time involved in the Samhain celebration. Nor could we find any evidence justifying an eight-hour period of time for celebration.

Finally, as to the inmates' food requests, the record indicates that the inmates only had problems with the second prison treatment director crossing food items off

of the list or reducing the quantity of food without explanation. The inmates have made no allegation that the third prison treatment director continued that practice.

Therefore, the inmates have failed to show that the ISP "substantially burdened" their observance of Samhain.

### B. *Mootness of Howrey's Injunctive Relief Claim*

According to Sperfslage, Howrey is no longer incarcerated at the ISP. Instead, he was transferred to the Iowa Medical and Classification Center in Oakdale, Iowa. Sperfslage asserts that when an inmate is no longer subject to the conditions of which he complains, his claim is moot.

Recently, in *Pratt v. Corrections Corp. of America*, 267 Fed. Appx. 482 (8th Cir. 2008) (unpublished per curiam), an inmate who was formerly housed in the Prairie Correctional Facility (PCF) in Minnesota appealed the district court's grant of summary judgment to the Corrections Corporation of America (CCA) and various CCA-PCF officials in his 42 U.S.C. § 1983 action on his RLUIPA claim, among others, regarding the denial of a prison diet containing Halal meat. *Id*. at 482. We determined that the inmate's claims for injunctive and declaratory relief were moot, as the inmate "is in federal custody and is no longer subject to CCA policy." *Id*. (citing *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (stating that an inmate's claims for declaratory and injunctive relief are moot when he is transferred to another facility and is no longer subject to alleged unlawful conditions)); *see also Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Wycoff v. Brewer*, 572 F.2d 1260, 1262 (8th Cir. 1978).

Applying *Pratt* to the present case, because Howrey is no longer incarcerated at the ISP and subject to the allegedly offending policy, his claims are moot.

-14-

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____